**INTL·FCStone®**



Futures and Exchange-Traded Options Account Documentation



# FCM Division of
# INTL FCStone Financial Inc.

**FCM DIVISION OF INTL FCSTONE FINANCIAL INC.**

230 S. LaSalle Street, Suite 10-500 | Chicago, Illinois 60604 | Telephone (312) 780-6700 |www.intlfcstone.com

© 2017 INTL FCStone Inc. All Rights Reserved.

**INTL · FCStone**

## Table of Contents

### Account Application

**Part I: Applicants who are Individuals, Joint Accounts, or Sole Proprietorships**

| | |
|---|---|
| Primary Account Owner Information | 1 |
| Primary Account Owner Financial Information | 4 |
| Privacy Policy and Anti-Money Laundering Notice | 5 |
| Acknowledgement Form | 6 |

**Part II:  Futures & Exchange-Traded Options Account**

| | |
|---|---|
| Commodity Futures Trading Commission Risk Disclosure | 7 |
| Options Disclosure Statement | 9 |
| Acknowledgement Of Disclosures | 13 |
| Futures & Exchange-Traded Options Customer Agreement | 17 |
| Arbitration Agreement | 26 |
| Request for Electronic Transmission of Customer Statements | 27 |
| Introducing Broker Authorization | 28 |
| Consent To Interaffiliate Funds Transfer | 29 |
| IRS Form W9 | 30 |

**INTL FCStone**

## Thank you for your interest in opening an account with INTL FCStone, Inc.

In order to complete your account application with us, please complete the following steps:

- Fill in all required information in the application provided.
- Sign all pages where a signature is required.

Once all pages have been completed and signed, please return the signed Account Application to INTL FCStone, Inc.:

Email: csc@intlfcstone.com

Fax: +1-816-410-5054

Mail: INTL FCStone, Inc.
ATTN: Client Service Center
1251 NW Briarcliff Parkway, Suite 800
Kansas City, MO 64116

If you have not already provided them, please include the following supporting documents with your Account Application:

- Copy of a Government Issued Photo ID or Passport

If you have any questions about how to complete the application process, please contact Client Service Center at:

Phone: +1-877-414-4435

Email: csc@intlfcstone.com

i

**INTL·FCStone**

## Part I: Individual & Joint Accounts or Sole Proprietorships

### Application Type

**Client Type:**

☑ Individual     ☐ Individual with Custodian: _____

☐ Joint Account     ☐ Sole Proprietorship

**Product Type**

☑ Futures/Exchange-Traded

☐ Options Swaps/OTC Derivatives

☐ Foreign Exchange (FX)

### Primary Account Owner Information

Are you a United States Citizen or Resident? Yes ☑ No ☐

Customer Name: PAUL YOON

Registered Address (P.O. Boxes Are Not Allowed): 1657 Federspiel Street

City: Fort Lee    Region: NJ    Postal Code: 07024

Country: US

Home Phone: _____ Business Phone: _____ Cell Phone: 917 528 2559

Email Address: PKyoon@gmail.com

Social Security Number ▓▓▓▓▓▓    Date of Birth: ▓▓▓▓▓▓ 1974

| | Day | Month | Year |

Government Issued ID: _____

If Foreign Individual, please provide your country of citizenship: _____

### Account Statement Information

Address for account statements if different from above.

Address: _____

City: _____ Region: _____

Postal Code: _____ Country: _____

### Employment Information

Please Provide your most recent employment information

Employment Status: Self employed    Years with Employer: 2012

If "Other" or "Self-Employed" please enter a brief description of your Employer Status:

Energy trader

Employer Name: _____ Title: _____

### Trading Information

**Trading Objective**

Hedging: ☐    Speculative: ☑

Please state Applicant's investment knowledge and experience:

| | Investment Types | Years |
|---|---|---|
| Commodity Types | Energy | since 2012 |
| Security Types | | |
| Over-The-Counter (OTC) | | |

1

**INTL · FCStone**®

---

### General Information

1. If any person or entity is guaranteeing Applicant's obligations, please provide the above information with respect to such guarantor on a separate sheet of paper.

2. Please provide a description of your business: [                    ]

   If "Other" please specify: [                    ]

3. Please state the source of assets used to fund this account (i.e. business activity, parent guarantee, other):

   *Bank account*

4. Is the Applicant soliciting funds for the purpose of investing:

   Yes ☐  No ☑

   If yes, is the Applicant registered as a pool or pool operator with the National Futures Association ("NFA")?

   Yes ☐  No ☐

5. Is the Applicant operating pursuant to a registration exemption under the Commodity Exchange Act?

   Yes ☐  No ☑

   If yes, which exemption: [                    ]

6. Does any unaffiliated person or entity have a financial interest in this account?

   Yes ☐  No ☑

7. Does any unaffiliated person or entity control the trading of this account?

   Yes ☐  No ☑

8. Is any controlling person of the Applicant or any member of its immediate family a current or former political official in any branch of government or affiliated with a government owned enterprise, other than the U.S. Government?

   Yes ☐  No ☑

2

**INTL·FCStone**

---

## General Information

9. Is the Applicant or any member of its immediate family an employee of, or related to an employee of the FCM Division of INTL FCStone Financial INC., or its subsidiaries?

Yes ☐ No ☑

Employee Name(s): _____

Relationship: _____

10. Does the Applicant or any of its affiliates or owners have an existing account open with INTL FCStone, Inc. or its subsidiaries?

Yes ☐ No ☑

If yes, please provide the account number: _____

11. Is the Applicant registered with the National Futures Association ("NFA") or any other regulatory body or a member of an exchange?

Yes ☐ No ☑

If yes, please list regulator and/or exchange and registration number:

Regulatory Body: _____

Registration Number: _____

12. Has the Applicant been the subject of a bankruptcy proceeding, receivership, or similar action?

Yes ☐ No ☑

13. Has the Applicant been in a legal dispute, arbitration, or reparations action related to a commodity account?

Yes ☐ No ☑

14. Has the Applicant ever closed an account with an unsatisfied debit balance at a commodity firm?

Yes ☐ No ☑

3

**INTL · FCStone**

## PRIMARY ACCOUNT HOLDER'S FINANCIAL INFORMATION

### Annual Revenue from All Sources in U.S. Dollars:

| | |
|---|---|
| ☐ Below $25,000 | If below $25,000 insert amount: $ |
| ☐ $25,000 - $50,000 | |
| ☐ $50,000 - $100,000 | |
| ☐ $100,000 - $250,000 | |
| ☐ $250,000 - $500,000 | |
| ☑ $500,000 - $1,000,000 | |
| ☐ $1,000,000 - $5,000,000 | |
| ☐ Greater Than $5,000,000 | If above $5,000,000 insert amount: $ |

### Total Net Worth in U.S. Dollars:
*Total assets minus total liabilities*

| | |
|---|---|
| ☐ Below $100,000 | If below $100,000 insert amount: $ |
| ☐ $100,000 - $500,000 | |
| ☐ $500,000 - $1,000,000 | |
| ☑ $1,000,000 - $5,000,000 | |
| ☐ Greater Than $5,000,000 | If above $5,000,000 insert amount: $ |

### Available Working Capital in U.S. Dollars:
*Current Liquid Assets*

| | |
|---|---|
| ☐ Below $25,000 | If below $25,000 insert amount: $ |
| ☐ $25,000 - $100,000 | |
| ☐ $100,000 - $250,000 | |
| ☐ $250,000 - $500,000 | |
| ☐ $500,000 - $1,000,000 | |
| ☑ $1,000,000 - $5,000,000 | |
| ☐ Greater Than $5,000,000 | If above $5,000,000 insert amount: $ |

4

**INTL FCStone**

## PRIVACY POLICY AND ANTI-MONEY LAUNDERING NOTICE

The FCM Division of INTL FCStone Financial Inc. and INTL FCStone Markets, LLC and its affiliates value its customer relationships. To provide consumers with financial products and services, we collect nonpublic personal information about you, including your name, address, age, date of birth, email address, occupation, employment information, telephone number, education, the kind of services provided to you, bank account and other financial information, and information about our transactions with you. We pledge to protect that information and ensure that it remains private. Pursuant to 17 C.F.R. Part 160, the affiliated registrants mentioned above, as well as FCC Futures, Inc. and Westown Commodities, LLC; are hereby providing the following notice to our customers who may have established an account for personal, family, or household purposes. We collect nonpublic personal information about consumers from the following sources:

- Information we receive on applications or other forms including, but not limited to, a consumer's social security number;
- Information from communication and interactions that we have with you;
- Information about transactions with us, our affiliates, or others;
- Information from third parties who provide consumer information or verify customer relationships; and
- Information we receive from consumer reporting agencies.

We may disclose the information we collect to companies that perform services on our behalf, our affiliated entities and other financial institutions with whom we have execution or clearing agreements, in order to provide you with the products and services you request from us. We may also disclose information to reporting agencies, self-regulatory organizations and governmental entities, to the extent we are required to do so by law. We restrict access to nonpublic personal information about you to those of our employees who need to know that information to provide products or services to you. We maintain electronic copies of this information on secure servers, and paper copies in our secured offices. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens and maintains an account. When you establish an account, we will ask for your name, address, date of birth and other information to allow us to identify you. We may also ask for a copy of your driver's license or other identification. Affiliated entities with whom we share information may use this information to make solicitations for marketing purposes. **If you have any questions about this Notice, please call +1 800-422-3087 or write us at INTL FCStone Inc., Attention: Corporate Counsel, 1075 Jordan Creek Parkway, Suite 300, West Des Moines, IA 50266.**

### Information Sharing Opt Out

If you do not wish to have your information shared for marketing purposes, please email compliance@intlfcstone.com listing your name, account number(s) with phone number where you can be reached or call +1 866-233-6806.

**INTL·FCStone**

## Acknowledgment Form

*To be completed by All Applicants*

The undersigned Applicant or agent acting on behalf of the Applicant (the "Customer"), acknowledges that the FCM Division of INTL FCStone Financial Inc. and INTL FCStone Markets, LLC respectively, are relying on the information herein as the basis of establishing one or more Customer accounts. The undersigned certifies, represents and warrants that all information, including audited or unaudited financials, or Applicants who fill out the income and net worth information in this Account Application and all other information provided is true and accurate.

If the Applicant becomes aware of any false statement or failure to state a material fact in this Account Application or the Agreements to which this Account Application relates and incorporates by reference, or if information contained in this Account Application and such Agreements subsequently changes, Applicant shall immediately notify the FCM Division of INTL FCStone Financial Inc. and INTL FCStone Markets, LLC respectively.

Check here ✔ if you are an Individual or Joint Account Applicant. Individual or Joint Account Applicants agree to provide combined information, and represent and warrant that documents comprising their financial information and statements have been prepared in accordance with accounting principles generally accepted in their country of organization, are complete and not misleading.

Check here ☐ if you are a Sole Proprietorship. Sole Proprietorships not registered as a Corporation, Partnership, Limited Liability Company, Trust or other entity as of the execution of this Account Application agree to notify the FCM Division of INTL FCStone Financial Inc. and INTL FCStone Markets, LLC respectively, 30 days in advance should they decide to convert their current business to an entity.

| Individual - Joint Account Holders - Sole Proprietorship | Corporation, Partnership, Limited Liability Company, Trust: (All General Partners sign) |
|---|---|
| Paul Yoon <br> Print Customer Name | Print Customer Entity Name |
| | Print Signatory Name |
| *(signature)* Date: 15 / 02 / 2018 <br> Signature    Day   Month   Year | Title |
| | Date: ☐ / ☐ / ☐ <br> Signature   Day   Month   Year |
| Print Joint Customer Name | Print Signatory Name |
| | Title |
| Date: ☐ / ☐ / ☐ <br> Signature   Day   Month   Year | Date: ☐ / ☐ / ☐ <br> Signature   Day   Month   Year |

6

**INTL FCStone**

## Part II: Futures & Exchange-Traded Options Account
## COMMODITY FUTURES TRADING COMMISSION RISK DISCLOSURE

The risk of loss in trading commodity futures contracts can be substantial. You should, therefore, carefully consider whether such trading is suitable for you in light of your circumstances and financial resources. You should be aware of the following points:

(1) You may sustain a total loss of the funds that you deposit with your broker to establish or maintain a position in the commodity futures market, and you may incur losses beyond these amounts. If the market moves against your position, you may be called upon by your broker to deposit a substantial amount of additional margin funds, on short notice, in order to maintain your position. If you do not provide the required funds within the time required by your broker, your position may be liquidated at a loss, and you will be liable for any resulting deficit in your account.

(2) The funds you deposit with a futures commission merchant for trading futures positions are not protected by insurance in the event of the bankruptcy or insolvency of the futures commission merchant, or in the event your funds are misappropriated.

(3) The funds you deposit with a futures commission merchant for trading futures positions are not protected by the Securities Investor Protection Corporation even if the futures commission merchant is registered with the Securities and Exchange Commission as a broker or dealer.

(4) The funds you deposit with a futures commission merchant are generally not guaranteed or insured by a derivatives clearing organization in the event of the bankruptcy or insolvency of the futures commission merchant, or if the futures commission merchant is otherwise unable to refund your funds. Certain derivatives clearing organizations, however, may have programs that provide limited insurance to customers. You should inquire of your futures commission merchant whether your funds will be insured by a derivatives clearing organization and you should understand the benefits and limitations of such insurance programs.

(5) The funds you deposit with a futures commission merchant are not held by the futures commission merchant in a separate account for your individual benefit. Futures commission merchants commingle the funds received from customers in one or more accounts and you may be exposed to losses incurred by other customers if the futures commission merchant does not have sufficient capital to cover such other customers' trading losses.

(6) The funds you deposit with a futures commission merchant may be invested by the futures commission merchant in certain types of financial instruments that have been approved by the Commission for the purpose of such investments. Permitted investments are listed in Commission Regulation 1.25 and include: U.S. government securities; municipal securities; money market mutual funds; and certain corporate notes and bonds. The futures commission merchant may retain the interest and other earnings realized from its investment of customer funds. You should be familiar with the types of financial instruments that a futures commission merchant may invest customer funds in.

(7) Futures commission merchants are permitted to deposit customer funds with affiliated entities, such as affiliated banks, securities brokers or dealers or foreign brokers. You should inquire whether your futures commission merchant deposits funds with affiliates and assess whether such deposits by the futures commission merchant with its affiliates increases the risks to your funds.

(8) You should consult your futures commission merchant concerning the nature of the protections available to safeguard funds or property deposited for your account.

(9) Under certain market conditions, you may find it difficult or impossible to liquidate a position. This can occur, for example, when the market reaches a daily price fluctuation limit ("limit move").

(10) All futures positions involve risk, and a "spread" position may not be less risky than an outright "long" or "short" position.

(11) The high degree of leverage (gearing) that is often obtainable in futures trading because of the small margin requirements can work against you as well as for you. Leverage (gearing) can lead to large losses as well as gains.

**INTL·FCStone**

(12) In addition to the risks noted in the paragraphs enumerated above, you should be familiar with the futures commission merchant you select to entrust your funds for trading futures positions. The Commodity Futures Trading Commission requires each futures commission merchant to make publicly available on its Web site firm specific disclosures and financial information to assist you with your assessment and selection of a futures commission merchant. Information regarding this futures commission merchant may be obtained on our Web site: https://intlfcstone.com/FCStoneDisclosure/

As of July 12, 2014 CFTC Regulation 1.55 requires that the FCM Division of INTL FCStone Financial Inc. provide all customers with a bespoke disclosure document, which may be viewed here: https://intlfcstone.com/FCStoneDisclosure/. Additionally, a hardcopy of this Disclosure Document may also be requested by contacting compliance@intlfcstone.com or (312)-780-6700. THE FOREGOING PROVISIONS APPLY TO ALL FUTURES TRADING WHETHER FOREIGN OR DOMESTIC. IN ADDITION, IF YOU ARE CONTEMPLATING TRADING FOREIGN FUTURES OR OPTIONS CONTRACTS, YOU SHOULD BE AWARE OF THE FOLLOWING ADDITIONAL RISKS:

(13) Foreign futures transactions involve executing and clearing trades on a foreign exchange. This is the case even if the foreign exchange is formally "linked" to a domestic exchange, whereby a trade executed on one exchange liquidates or establishes a position on the other exchange. No domestic organization regulates the activities of a foreign exchange, including the execution, delivery, and clearing of transactions on such an exchange, and no domestic regulator has the power to compel enforcement of the rules of the foreign exchange or the laws of the foreign country. Moreover, such laws or regulations will vary depending on the foreign country in which the transaction occurs. For these reasons, customers who trade on foreign exchanges may not be afforded certain of the protections which apply to domestic transactions, including the right to use domestic alternative dispute resolution procedures. In particular, funds received from customers to margin foreign futures transactions may not be provided the same protections as funds received to margin futures transactions on domestic exchanges. Before you trade, you should familiarize yourself with the foreign rules which will apply to your particular transaction.

(14) Finally, you should be aware that the price of any foreign futures or option contract and, therefore, the potential profit and loss resulting therefrom, may be affected by any fluctuation in the foreign exchange rate between the time the order is placed and the foreign futures contract is liquidated or the foreign option contract is liquidated or exercised.

THIS BRIEF STATEMENT CANNOT DISCLOSE ALL THE RISKS AND OTHER ASPECTS OF THE COMMODITY MARKETS.

I hereby acknowledge that I have received and understood this risk disclosure statement.

| Individual - Joint Account Holders - Sole Proprietorship | Corporation, Partnership, Limited Liability Company, Trust: (All General Partners sign) |
|---|---|
| _Paul Yoon_ | |
| Print Customer Name | Print Customer Entity Name |
| | Print Signatory Name |
| _[signature]_ Date: 15 / 02 / 2018 | |
| Signature _Day Month Year_ | Title |
| | Signature Date: __ / __ / __ _Day Month Year_ |
| Print Joint Customer Name | Print Signatory Name |
| | Title |
| Signature Date: __ / __ / __ _Day Month Year_ | Signature Date: __ / __ / __ _Day Month Year_ |

8

**INTL FCStone**

## OPTIONS DISCLOSURE STATEMENT

BECAUSE OF THE VOLATILE NATURE OF THE COMMODITIES MARKETS, THE PURCHASE AND GRANTING OF COMMODITY OPTIONS INVOLVE A HIGH DEGREE OF RISK. COMMODITY OPTION TRANSACTIONS ARE NOT SUITABLE FOR MANY MEMBERS OF THE PUBLIC. SUCH TRANSACTIONS SHOULD BE ENTERED INTO ONLY BY PERSONS WHO HAVE READ AND UNDERSTOOD THIS DISCLOSURE STATEMENT AND WHO UNDERSTAND THE NATURE AND EXTENT OF THEIR RIGHTS AND OBLIGATIONS AND OF THE RISKS INVOLVED IN THE OPTION TRANSACTIONS COVERED BY THIS DISCLOSURE STATEMENT.

BOTH THE PURCHASER AND THE GRANTOR SHOULD KNOW THAT THE OPTION IF EXERCISED, RESULTS IN THE ESTABLISHMENT OF A FUTURES CONTRACT (AN "OPTION ON A FUTURES CONTRACT"). BOTH THE PURCHASER AND THE GRANTOR SHOULD KNOW WHETHER THE PARTICULAR OPTION IN WHICH THEY CONTEMPLATE TRADING IS SUBJECT TO A "STOCK-STYLE" OR "FUTURES-STYLE" SYSTEM OF MARGINING. UNDER A STOCK-STYLE MARGINING SYSTEM, A PURCHASER IS REQUIRED TO PAY THE FULL PURCHASE PRICE OF THE OPTION AT THE INITIATION OF THE TRANSACTION. THE PURCHASER HAS NO FURTHER OBLIGATION ON THE OPTION POSITION. UNDER A FUTURES-STYLE MARGINING SYSTEM, THE PURCHASER DEPOSITS INITIAL MARGIN AND MAY BE REQUIRED TO DEPOSIT ADDITIONAL MARGIN IF THE MARKET MOVES AGAINST THE OPTION POSITION. THE PURCHASER'S TOTAL SETTLEMENT VARIATION MARGIN OBLIGATION OVER THE LIFE OF THE OPTION, HOWEVER, WILL NOT EXCEED THE ORIGINAL OPTION PREMIUM, ALTHOUGH SOME INDIVIDUAL PAYMENT OBLIGATIONS AND/OR RISK MARGIN REQUIREMENTS MAY AT TIMES EXCEED THE ORIGINAL OPTION PREMIUM. IF THE PURCHASER OR GRANTOR DOES NOT UNDERSTAND HOW OPTIONS ARE MARGINED UNDER A STOCK-STYLE OR FUTURES-STYLE MARGINING SYSTEM, HE OR SHE SHOULD REQUEST AN EXPLANATION FROM THE FUTURES COMMISSION MERCHANT ("FCM") OR INTRODUCING BROKER ("IB").

A PERSON SHOULD NOT PURCHASE ANY COMMODITY OPTION UNLESS HE OR SHE IS ABLE TO SUSTAIN A TOTAL LOSS OF THE PREMIUM AND TRANSACTION COSTS OF PURCHASING THE OPTION. A PERSON SHOULD NOT GRANT ANY COMMODITY OPTION UNLESS HE OR SHE IS ABLE TO MEET ADDITIONAL CALLS FOR MARGIN WHEN THE MARKET MOVES AGAINST HIS OR HER POSITION AND, IN SUCH CIRCUMSTANCES, TO SUSTAIN A VERY LARGE FINANCIAL LOSS. A PERSON WHO PURCHASES AN OPTION SUBJECT TO STOCK-STYLE MARGINING SHOULD BE AWARE THAT, IN ORDER TO REALIZE ANY VALUE FROM THE OPTION, IT WILL BE NECESSARY EITHER TO OFFSET THE OPTION POSITION OR TO EXERCISE THE OPTION. OPTIONS SUBJECT TO FUTURES-STYLE MARGINING ARE MARKED TO MARKET, AND GAINS AND LOSSES ARE PAID AND COLLECTED DAILY. IF AN OPTION PURCHASER DOES NOT UNDERSTAND HOW TO OFFSET OR EXERCISE AN OPTION, THE PURCHASER SHOULD REQUEST AN EXPLANATION FROM THE FCM OR IB. CUSTOMERS SHOULD BE AWARE THAT IN A NUMBER OF CIRCUMSTANCES, SOME OF WHICH WILL BE DESCRIBED IN THIS DISCLOSURE STATEMENT, IT MAY BE DIFFICULT OR IMPOSSIBLE TO OFFSET AN EXISTING OPTION POSITION ON AN EXCHANGE.

THE GRANTOR OF AN OPTION SHOULD BE AWARE THAT, IN MOST CASES, A COMMODITY OPTION MAY BE EXERCISED AT ANY TIME FROM THE TIME IT IS GRANTED UNTIL IT EXPIRES. THE PURCHASER OF AN OPTION SHOULD BE AWARE THAT SOME OPTION CONTRACTS MAY PROVIDE ONLY A LIMITED PERIOD OF TIME FOR EXERCISE OF THE OPTION. THE PURCHASER OF A PUT OR CALL SUBJECT TO STOCK-STYLE OR FUTURES-STYLE MARGINING IS SUBJECT TO THE RISK OF LOSING THE ENTIRE PURCHASE PRICE OF THE OPTION—THAT IS, THE PREMIUM CHARGED FOR THE OPTION PLUS ALL TRANSACTION COSTS. THE COMMODITY FUTURES TRADING COMMISSION REQUIRES THAT ALL CUSTOMERS RECEIVE AND ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE STATEMENT BUT DOES NOT INTEND THIS STATEMENT AS A RECOMMENDATION OR ENDORSEMENT OF EXCHANGE-TRADED COMMODITY OPTIONS.

(1) *Some of the risks of option trading.*

Specific market movements of the underlying future cannot be predicted accurately. The grantor of a call option who does not have a long position in the underlying futures contract is subject to risk of loss should the price of the underlying futures contract be higher than the strike price upon exercise or expiration of the option by an amount greater than the premium received for granting the call option. The grantor of a call option who has a long position in the underlying futures contract is subject to the full risk of a decline in price of the underlying position reduced by the premium received for granting the call. In exchange for the premium received for granting a call option, the option grantor gives up all of the potential gain resulting from an increase in the price of the underlying futures contract above the option strike price upon exercise or expiration of the option. The grantor of a put option who does not have a short position in the underlying futures contract is subject to risk of loss should the price of the underlying futures contract decrease below the strike price upon exercise or expiration of the option by an amount in excess of the premium received for granting the put option. The grantor of a put option on a futures contract who has a short position in the underlying futures contract is subject to the full risk of a rise in the price in the underlying position reduced by the premium received for granting the put. In exchange for the premium received for granting a put option on a futures contract, the option grantor gives up all of the potential gain resulting from a decrease in the price of the underlying futures contract below the option strike price upon exercise or expiration of the option.

9

(2) *Description of commodity options.*

Prior to entering into any transaction involving a commodity option, an individual should thoroughly understand the nature and type of option involved and the underlying futures contract. The futures commission merchant or introducing broker is required to provide, and the individual contemplating an option transaction should obtain:

    (i)    An identification of the futures contract underlying the option and which may be purchased or sold upon exercise of the option or, if applicable, whether exercise of the option will be settled in cash;

    (ii)    The procedure for exercise of the option contract, including the expiration date and latest time on that date for exercise. (The latest time on an expiration date when an option may be exercised may vary; therefore, option market participants should ascertain from their futures commission merchant or their introducing broker the latest time the firm accepts exercise instructions with respect to a particular option.);

    (iii)    A description of the purchase price of the option including the premium, commissions, costs, fees and other charges. (Since commissions and other charges may vary widely among futures commission merchants and among introducing brokers, option customers may find it advisable to consult more than one firm when opening an option account.);

    (iv)    A description of all costs in addition to the purchase price which may be incurred if the commodity option is exercised, including the amount of commissions (whether termed sales commissions or otherwise), storage, interest, and all similar fees and charges which may be incurred;

    (v)    An explanation and understanding of the option margining system;

    (vi)    A clear explanation and understanding of any clauses in the option contract and of any items included in the option contract explicitly or by reference which might affect the customer's obligations under the contract. This would include any policy of the futures commission merchant or the introducing broker or rule of the exchange on which the option is traded that might affect the customer's ability to fulfill the option contract or to offset the option position in a closing purchase or closing sale transaction (for example, due to unforeseen circumstances that require suspension or termination of trading); and

    (vii)    If applicable, a description of the effect upon the value of the option position that could result from limit moves in the underlying futures contract.

(3) *The mechanics of option trading.*

Before entering into any exchange-traded option transaction, an individual should obtain a description of how commodity options are traded. Option customers should clearly understand that there is no guarantee that option positions may be offset by either a closing purchase or closing sale transaction on an exchange. In this circumstance, option grantors could be subject to the full risk of their positions until the option position expires, and the purchaser of a profitable option might have to exercise the option to realize a profit. For an option on a futures contract, an individual should clearly understand the relationship between exchange rules governing option transactions and exchange rules governing the underlying futures contract. For example, an individual should understand what action, if any, the exchange will take in the option market if trading in the underlying futures market is restricted or the futures prices have made a "limit move." The individual should understand that the option may not be subject to daily price fluctuation limits while the underlying futures may have such limits, and, as a result, normal pricing relationships between options and the underlying future may not exist when the future is trading at its price limit. Also, underlying futures positions resulting from exercise of options may not be capable of being offset if the underlying future is at a price limit.

(4) *Margin requirements.*

An individual should know and understand whether the option he or she is contemplating trading is subject to a stock-style or futures-style system of margining. Stock-style margining requires the purchaser to pay the full option premium at the time of purchase. The purchaser has no further financial obligations, and the risk of loss is limited to the purchase price and transaction costs. Futures-style margining requires the purchaser to pay initial margin only at the time of purchase. The option position is marked to market, and gains and losses are collected and paid daily. The purchaser's risk of loss is limited to the initial option premium and transaction costs. An individual granting options under either a stock-style or futures-style system of margining should understand that he or she may be required to pay additional margin in the case of adverse market movements.

INTL FCStone

(5) *Profit potential of an option position.*
An option customer should carefully calculate the price which the underlying futures contract would have to reach for the option position to become profitable. Under a stock-style margining system, this price would include the amount by which the underlying futures contract would have to rise above or fall below the strike price to cover the sum of the premium and all other costs incurred in entering into and exercising or closing (offsetting) the commodity option position. Under a future-style margining system, option positions would be marked to market, and gains and losses would be paid and collected daily, and an option position would become profitable once the variation margin collected exceeded the cost of entering the contract position. Also, an option customer should be aware of the risk that the futures price prevailing at the opening of the next trading day may be substantially different from the futures price which prevailed when the option was exercised.

(6) *Deep-out-of-the-money options.*
A person contemplating purchasing a deep-out-of-the-money option (that is, an option with a strike price significantly above, in the case of a call, or significantly below, in the case of a put, the current price of the underlying futures contract) should be aware that the chance of such an option becoming profitable is ordinarily remote. On the other hand, a potential grantor of a deep-out-of-the-money option should be aware that such options normally provide small premiums while exposing the grantor to all of the potential losses described in section (1) of this disclosure statement.

(7) *Glossary of terms—*

(i)     Contract market. Any board of trade (exchange) located in the United States which has been designated by the Commodity Futures Trading Commission to list a futures contract or commodity option for trading.

(ii)    Exchange-traded option; put option; call option. The options discussed in this disclosure statement are limited to those which may be traded on a contract market. These options (subject to certain exceptions) give an option purchaser the right to buy in the case of a call option, or to sell in the case of a put option, a futures contract underlying the option at the stated strike price prior to the expiration date of the option. Each exchange-traded option is distinguished by the underlying futures contract, strike price, expiration date, and whether the option is a put or a call.

(iii)   Underlying futures contract. The futures contract which may be purchased or sold upon the exercise of an option on a futures contract.

(iv)    [Reserved]

(v)     *Class of options.* A put or a call covering the same underlying futures contract.

(vi)    *Series of options.* Options of the same class having the same strike price and expiration date.

(vii)   *Exercise price. See* strike price.

(viii)  *Expiration date.* The last day when an option may be exercised.

(ix)    *Premium.* The amount agreed upon between the purchaser and seller for the purchase or sale of a commodity option.

(x)     *Strike price.* The price at which a person may purchase or sell the underlying futures contract upon exercise of a commodity option. This term has the same meaning as the term "exercise price."

(xi)    *Short option position. See* opening sale transaction.

(xii)   *Long option position. See* opening purchase transaction.

(xiii)  *Types of options transactions—*

(A) *Opening purchase transaction.* A transaction in which an individual purchases an option and thereby obtains a long option position.

(B) *Opening sale transaction.* A transaction in which an individual grants an option and thereby obtains a short option position.

11

**INTL·FCStone**

(C) *Closing purchase transaction.* A transaction in which an individual with a short option position liquidates the position. This is accomplished by a closing purchase transaction for an option of the same series as the option previously granted. Such a transaction may be referred to as an offset transaction.

(D) *Closing sale transaction.* A transaction in which an individual with a long option position liquidates the position. This is accomplished by a closing sale transaction for an option of the same series as the option previously purchased. Such a transaction may be referred to as an offset transaction.

(xiv)    *Purchase price.* The total actual cost paid or to be paid, directly or indirectly, by a person to acquire a commodity option. This price includes all commissions and other fees, in addition to the option premium.

(xv)    *Grantor, writer, seller.* An individual who sells an option. Such a person is said to have a short position.

(xvi)    *Purchaser.* An individual who buys an option. Such a person is said to have a long position.

| Individual - Joint Account Holders - Sole Proprietorship | Corporation, Partnership, Limited Liability Company, Trust: (All General Partners sign) |
|---|---|
| Paul Yoon | |
| Print Customer Name | Print Customer Entity Name |
| | |
| | Print Signatory Name |
| Signature   Date: 15 / 02 / 2018 Day Month Year | |
| | Title |
| | Signature   Date: / / Day Month Year |
| Print Joint Customer Name | Print Signatory Name |
| | |
| | Title |
| Signature   Date: / / Day Month Year | Signature   Date: / / Day Month Year |

12

**INTL FCStone**

## ACKNOWLEDGEMENT OF DISCLOSURES

### A. NFA Additional Risk Disclosure

In light of the financial and personal information provided on the Account Application, it may be interpreted that the funds committed to opening a futures options/account with the FCM Division of INTL FCStone Financial Inc. may be a substantial portion of annual income and/or net worth. Futures/option trading is a high risk investment strategy in light of the personal information and investment experience provided, including but not limited to, information based on age, annual income, net worth, and futures trading experience. Based on the above criteria, we are providing you with the following NFA Additional Risk Disclosure:

THE RISK OF LOSS IN TRADING COMMODITY FUTURES/OPTIONS CAN BE SUBSTANTIAL. DUE TO THE HIGH DEGREE OF LEVERAGE THAT IS OBTAINABLE IN FUTURES TRADING, MARKET MOVEMENTS MAY BE BENEFICIAL OR DETRIMENTAL TO A CUSTOMER; NOTE THAT LEVERAGE CAN LEAD TO LARGE LOSSES AS WELL AS GAINS. MARKET MOVEMENTS MAY CAUSE A LOSS OF ALL CUSTOMER FUNDS DEPOSITED AS INITIAL MARGIN; AND SUBSTANTIAL AMOUNTS OF ADDITIONAL CAPITAL ABOVE AND BEYOND INITIAL MARGIN MAY BE NECESSARY. IN INSTANCES WHERE ADDITIONAL FUNDS ARE REQUIRED, BUT NOT DEPOSITED, POSITIONS COULD BE LIQUIDATED AT A LOSS. IN SUCH INSTANCES, THE CUSTOMER WOULD BE RESPONSIBLE FOR COVERING ANY SHORT FALLS. PLEASE KEEP IN MIND THAT THIS STATEMENT IS NOT INCLUSIVE OF ALL RISKS ASSOCIATED WITH TRADING COMMODITY FUTURES/OPTIONS. ONLY RISK CAPITAL (MONEY THAT YOU ARE ABLE TO LOSE WITHOUT ADVERSELY AFFECTING YOUR STANDARD OF LIVING) SHOULD BE INVESTED. THE FCM DIVISION OF INTL FCSTONE FINANCIAL INC. RECOMMENDS THAT YOU REVIEW THE RISK DISCLOSURE STATEMENT IN THE ACCOUNT AGREEMENT AND/OR DISCUSS ANY CONCERNS WITH YOUR BROKER OR OTHER FINANCIAL ADVISOR BEFORE FINALIZING YOUR DECISION.

### B. Additional Risk Disclosure

- Detailed information for the following additional disclosures can be found at: http://lc.fia.org/uniform-futures-and-options-futures-risk-disclosures. Please confirm with your Account Representative whether the *optional disclosures apply to your specific account.
- **Cross Trade Consent.** Please see review information concerning our right to be on the opposite side of orders for physical transactions or for purchases or sales of futures contracts and options thereon placed for your Account.
- ***Notice Regarding Average Price System ("APS").** Please review information concerning the Average Price System, which is one of the different types of pricing methods we may employ to confirm trades.
  Average Prices that are not calculated by an exchange system will be calculated by us. Trades confirmed to you at average prices will be designated as such on your daily and monthly statements.
- **Uniform Notification Regarding Access to Market Data.** Please review information concerning your obligations as a market user with respect to Market Data that you may obtain through an electronic trading system, software or device provided or made available to you by a broker or an affiliate of such.
- **Disclosure Statement on Futures Exchange Ownership Interests and Incentive Programs.** Please review information concerning the financial benefit that the FCM Division of INTL FCStone Financial Inc. or its affiliates may receive from owning some form of ownership interest in one or more exchanges and clearing houses that you may trade on or that may clear your trades.
- **CME Disclosure Statement for Payment for Order Flow.** Please review information concerning potential relationships that your executing firm may have with other parties, and the potential payments associated with those relationships.
- ***Direct Order Transmittal Client Disclosure Statement.** Please review information concerning the risks that may be associated with transactions that are executed on your behalf on exchanges that are located outside of the United States.
- ***Foreign Trader Disclosure Statement.** Please review information concerning rules and regulations that apply to foreign traders.
- ***Position Limit and Large Open Position Reporting Requirements for Options and Futures Traded on Hong Kong Exchange.** Please review information concerning the position limit and reportable position requirements that the Hong Kong regulatory regime imposes for stock options and futures contracts traded on the Stock Exchange of Hong Kong and on the Hong Kong Futures Exchange.
- ***A Guide to the Structure and Market Technology of the London Metal Exchange (LME).** Please review information about LME market structure, terminology, and order execution. Contact Compliance at Compliance@intlfcstone.com or by phone at 1-866-233-6806 with any questions.
- **FCM Exemption Notice condition 6(f) wording for inclusion in FIA New Zealand disclosure supplement.** The FCM Division of INTL FCStone Financial Inc. is acting in reliance on the Financial Markets Conduct (US Futures Commission Merchants) Exemption Notice 2015 (New Zealand), is not required to comply with the obligations in relation to derivatives investor money and derivatives investor property in regulations 238 to 250 of the Financial Markets Conduct Regulations 2014 (New Zealand), and is instead required to comply with the rules and regulations made under the Commodity Exchange Act 1936 (US), including the regulations contained in Title 17 of Chapter 1 of the Code of Federal Regulations of the United States of America (or any other rules or regulations that, with or without modification, replace, or correspond to, those rules and regulations).

13

INTL FCStone

### C. Disclosure of Material Conflicts of Interest

This disclosure provides you with information about some of the material conflicts of interest that may arise between you and the FCM Division of INTL FCStone Financial Inc. ("FCM") performing services for you with respect to futures, options on futures, and if applicable, swaps, forwards or other commodity derivatives as defined in the Commodity Exchange Act ("Contracts").

Conflicts of interests can arise in particular when FCM has an economic or other incentive to act, or persuade you to act, in a way that favors FCM or its affiliates. Under applicable law, including regulations of the Commodity Futures Trading Commission ("CFTC"), not all swaps are required to be executed on an exchange or swap execution facility (each, a "Trading Facility"), even if a Trading Facility lists the swap for trading. In such circumstances, it may be financially advantageous for FCM or its affiliate to execute a swap with you bilaterally in the over-the-counter market rather than on a Trading Facility and, to the extent permitted by applicable law, we may have an incentive to persuade you to execute your swap bilaterally. You may choose the CFTC-registered derivatives clearing organization ("Clearing House") to which you submit a swap for clearing. You should be aware that FCM may not be a member of, or may not otherwise be able to submit your swap to, the Clearing House of your choice. FCM consequently has an incentive to persuade you to use a Clearing House of which FCM or its affiliate is a member. You also should be aware that FCM or its affiliate may own stock in, or have some other form of ownership interest in, one or more U.S. or foreign Trading Facilities or Clearing Houses where your transactions in Contracts may be executed and/or cleared. As a result, FCM or its affiliate may receive financial or other benefits related to its ownership interest when Contracts are executed on a given Trading Facility or cleared through a given Clearing House, and FCM would, in such circumstances, have an incentive to cause Contracts to be executed on that Trading Facility or cleared by that Clearing House. In addition, employees and officers of FCM or its affiliate may also serve on the board of directors or on one or more committees of a Trading Facility or Clearing House. In addition, Trading Facilities and Clearing Houses may from time to time have in place other arrangements that provide their members or participants with volume, market-making or other discounts or credits, may call for members or participants to pre-pay fees based on volume thresholds, or may provide other incentive or arrangements that are intended to encourage market participants to trade on or direct trades to that Trading Facility or Clearing House. FCM or its affiliate may participate in and obtain financial benefits from such incentive programs.

When we provide execution services to you (either in conjunction with clearing services or in an execution-only capacity), we may direct orders to affiliated or unaffiliated market-makers, other executing firms, individual brokers or brokerage groups for execution. When such affiliated or unaffiliated parties are used, they may, where permitted, agree to price concessions, volume discounts or refunds, rebates or similar payments in return for receiving such business. Likewise, where permitted by law and the rules of the applicable Trading Facility, we may solicit a counterparty to trade opposite your order or enter into transactions for its own account or the account of other counterparties that may, at times, be adverse to your interests in a Contract. In such circumstances, that counterparty may make payments and/or pay a commission to FCM in connection with that transaction. The results of your transactions may differ significantly from the results achieved by us for our own account, our affiliates, or for other customers. In addition, where permitted by applicable law (including, where applicable, the rules of the applicable Trading Facility), FCM, its directors, officers, employees and affiliates may act on the other side of your order or transaction by the purchase or sale for an account, or the execution of a transaction with a counterparty, in which FCM or a person affiliated with FCM has a direct or indirect interest, or may affect any such order with a counterparty that provides FCM or its affiliates with discounts related to fees for Contracts or other products. In cases where we have offered you a discounted commission or clearing fee for Contracts executed through FCM as agent or with FCM or its affiliate acting as counterparty, FCM or its affiliate may be doing so because of the enhanced profit potential resulting from acting as executing broker or counterparty. FCM or its affiliate may act as, among other things, an investor, research provider, placement agent, underwriter, distributor, remarketing agent, structurer, securitizer, lender, investment manager, investment adviser, commodity trading advisor, municipal advisor, market maker, trader, prime broker or clearing broker. In those and other capacities, FCM, its directors, officers, employees and affiliates may take or hold positions in, or advise other customers and counterparties concerning, or publish research or express a view with respect to, a Contract or a related financial instrument that may be the subject of advice from us to you. Any such positions and other advice may not be consistent with, or may be contrary to, your interests or to positions which are the subject of advice previously provided by FCM or its affiliate to you, and unless otherwise disclosed in writing, we are not necessarily acting in your best interest and are not assessing the suitability for you of any Contract or related financial instrument. Acting in one or more of the capacities noted above may give FCM or its affiliate access to information relating to markets, investments and products. As a result, FCM or its affiliate may be in possession of information which, if known to you, might cause you to seek to dispose of, retain or increase your position in one or more Contracts or other financial instruments. FCM and its affiliate will be under no duty to make any such information available to you, except to the extent we have agreed in writing or if required under applicable law.

14

**D. Electronic Trading and Order Routing Disclosure**

Electronic trading and order routing systems differ from traditional open outcry pit trading and manual order routing methods. Transactions using an electronic system are subject to the rules and regulations of the exchange(s) offering the system and/or listing the contract. Before you engage in transactions using an electronic system, you should carefully review the rules and regulations of the exchange(s) offering the system and/or listing contracts you intend to trade.

### DIFFERENCES AMONG ELECTRONIC TRADING SYSTEMS

Trading or routing orders through electronic systems varies widely among the different electronic systems. You should consult the rules and regulations of the exchange offering the electronic system and/or listing the contract traded or order routed to understand, among other things, in the case of trading systems, the system's order matching procedure, opening and closing procedures and prices, error trade policies, and trading limitations or requirements; and in the case of all systems, qualifications for access and grounds for termination and limitations on the types of orders that may be entered into the system. Each of these matters may present different risk factors with respect to trading on or using a particular system. Each system may also present risks related to system access, varying response times and security. In the case of internet-based systems, there may be additional types of risks related to system access, varying response times and security, as well as risks related to service providers and the receipt and monitoring of electronic mail.

### RISKS ASSOCIATED WITH SYSTEM FAILURE

Trading through an electronic trading or order routing system exposes you to risks associated with system or component failure. In the event of system or component failure, it is possible that, for a certain time period, you may not be able to enter new orders, execute existing orders, or modify or cancel orders that were previously entered. System or component failure may also result in loss of orders or order priority.

### SIMULTANEOUS OPEN OUTCRY PIT AND ELECTRONIC TRADING

Some contracts offered on an electronic trading system may be traded electronically and through open outcry during the same trading hours. You should review the rules and regulations of the exchange offering the system and/or listing the contract to determine how orders that do not designate a particular process will be executed.

### LIMITATION OF LIABILITY

Exchanges offering an electronic trading or order routing system and/or listing the contract may have adopted rules to limit their liability, the liability of FCMs or swap dealers, and software and communication system vendors and the amount of damages you may collect for system failure and delays. These limitations of liability provisions vary among the exchanges. You should consult the rules and regulations of the relevant exchange(s) in order to understand these liability limitations. Each exchange's rules are available upon request from the industry professional with whom you have an account. Some exchanges' relevant rules also are available on the exchange's website.

**INTL·FCStone**

### E. Notice to Omnibus Accounts Regarding Restrictions on Access for Sanctioned Parties

Futures exchanges ("Exchanges") may prohibit direct and indirect access to a market participant that is a "sanctioned party" (or similar term) as defined by the given Exchange's rules. For example, Chicago Mercantile Exchange Inc., The Board of Trade of the City of Chicago, Inc., New York Mercantile Exchange, Inc., and Commodity Exchange, Inc. define "Sanctioned Party" as "parties that are (i) identified on the Specially Designated Nationals and Blocked Person List of the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") ("Restricted Persons"), (ii) 50% or more owned by Restricted Persons, (iii) located in a country or territory subject to comprehensive economic sanctions administered by OFAC ("Restricted Country or Territory" or "Restricted Countries or Territories"), (iv) owned or controlled by the governments of Restricted Countries or Territories, (v) subject to OFAC restrictions where such restriction prohibits a specific activity which would in turn prohibit the party from trading on an exchange or settling a transaction at an exchange, (vi) subject to restrictions administered or imposed by a state or government authority authorized to issue economic sanctions and blocking measures that has jurisdiction over a Clearing Member (each a "Sanctioning Body") or (vii) acting on behalf of any of the foregoing."

Accordingly, omnibus accounts are expressly prohibited from acting for customers, directly or indirectly, that are sanctioned parties (or similar term) under relevant Exchange rules. Moreover, as the holder of an omnibus account, you must notify all of your omnibus account customers of such prohibition.

If you become aware that a sanctioned party (or similar term) under Exchange rules is directly or indirectly acting through the omnibus account, you must immediately notify INTL FCStone Financial inc. and, unless permitted (either not restricted or specifically authorized) by OFAC and/or any sanctioning body, as applicable, under Exchange rules, cancel all direct and indirect access to the omnibus account by such market participant.

#### Please sign below to acknowledge that you have read and understand the following disclosures:

A  NFA Additional Risk Disclosure

B  Additional Risk Disclosure

C  Disclosure of Material Conflicts of Interest

D  Electronic Trading and Order Routing Systems Disclosure Statement

E  Notice to Omnibus Accounts Regarding Restrictions on Access for Sanctioned Parties

**CUSTOMER(S) PLEASE SIGN AND DATE BELOW**

| Individual - Joint Account Holders - Sole Proprietorship | Corporation, Partnership, Limited Liability Company, Trust: (All General Partners sign) |
|---|---|
| *Paul Yoon* <br> Print Customer Name | Print Customer Entity Name |
| | Print Signatory Name |
| *[signature]*   Date: 15 / 02 / 20 ● <br> Signature    Day   Month   Year | Title |
| | Date: __ / __ / __ <br> Signature   Day   Month   Year |
| Print Joint Customer Name | Print Signatory Name |
| | Title |
| Date: __ / __ / __ <br> Signature   Day   Month   Year | Date: __ / __ / __ <br> Signature   Day   Month   Year |

16

**INTL FCStone**

## FCM DIVISION OF INTL FCSTONE FINANCIAL INC.
## FUTURES & EXCHANGE-TRADED OPTIONS CUSTOMER AGREEMENT

READ THIS ENTIRE AGREEMENT BEFORE SIGNING.

This Futures & Exchange-Traded Options Customer Agreement (the "Agreement") is entered into as of the date below between the undersigned Customer and the FCM Division of INTL FCStone Financial Inc., acting in its capacity as a futures commission merchant ("FCM"), (each referred to individually as a "Party" or collectively, the "Parties") to enable the Customer to establish a non-discretionary account, unless additional documents are executed relating to a discretionary account, for the purchase and sale of futures contracts, option contracts thereon, commodity futures, cash commodities forward contracts, currency conversions, on-exchange foreign currency-denominated financial instruments, cleared swaps and transactions related thereto ("Commodity Interests"). This Agreement shall be continuous and shall cover all of the Customer's accounts established at any time or closed and re-established from time to time, irrespective of any change at any time in FCM personnel or an assignment, reorganization, consolidation or merger of the FCM, and shall inure to the benefit of FCM and its successors and assigns, binding upon Customer and its estate, executors, administrators, legal representatives, successors and assigns. Customer hereby ratifies all Commodity Interest transactions effected with FCM prior to and following the date of this Agreement, and agrees that the rights and obligations of Customer with respect to all such transactions shall be governed by the terms of this Agreement, which shall supersede all other agreements between FCM and Customer.

1. Instructions. Customer authorizes FCM to purchase and sell Commodity Interests for Customer's account in accordance with Customer's oral or written instructions. If Customer has appointed an agent with authority to exercise discretion over trades in Customer's account, on the Customer's behalf pursuant to the Account Application, such as an Introducing Broker independent and unaffiliated with FCM ("IB"), or a commodity trading adviser ("CTA") or other agent ("Agent"), then the Customer's Agent is authorized to purchase and sell Commodity Interests for Customer's account in accordance with Customer's oral or written instructions to the FCM. Customer authorizes FCM to make advances and expend Customer's funds, to borrow and deliver funds, securities or property as may be required with respect to such transactions. FCM shall be under no duty or obligation to inquire into the purpose or propriety of any instruction or transaction given by any Agent of the Customer, other than a guaranteed introducing broker of the FCM (a "GIB"), or any Customer in the case of a joint account. FCM shall be under no obligation to oversee the application of any funds delivered to any Customer or third party in accordance with Customer's instructions.

2. Orders. All orders to buy or sell Commodity Interests must be complete and contain the following information: (a) Whether such order is a buy or sell order; (b) Customer's identity and account number; (c) Commodity Interest; (d) Quantity; (e) Price, if applicable; (f) Commodity Interest(s) delivery month; and (g) Any special instructions. Customer acknowledges that FCM may reject any order if Customer does not have sufficient margin on deposit, and may delay the processing of any order while determining the margin status of Customer's Account.

Customer further agrees to contact FCM by telephone or email to verify the account status within two (2) business days after placing any order if Customer has not been advised by telephone or email of the status of such order by FCM within twenty-four (24) hours of placing the order(s). CUSTOMER AGREES THAT FAILURE TO CONTACT FCM AS PROVIDED ABOVE SHALL RELIEVE FCM OF ANY RESPONSIBILITY ARISING FROM THE LACK OF EXECUTION OF SUCH ORDER(S). CUSTOMER FURTHER ACKNOWLEDGES ALL ORDERS SHALL BE GOOD FOR THE DAY SUCH ORDERS ARE PLACED ONLY, UNLESS SPECIFIED BY THE CUSTOMER TO BE OPEN UNTIL CANCELLED.

3. NO FCM LIABILITY FOR AGENTS, MANAGED ACCOUNTS OR ACCOUNTS INTRODUCED BY INDEPENDENT INTRODUCING BROKERS. CUSTOMER'S INTRODUCING BROKER IS RESPONSIBLE FOR COLLECTING FUNDS ON CUSTOMER'S BEHALF AND DIRECTING WITHDRAWALS OF FUNDS FROM CUSTOMER'S ACCOUNT IN EXCESS, IF ANY, OF THAT REQUIRED TO MAINTAIN APPLICABLE MARGIN. FCM IS NOT RESPONSIBLE FOR FUNDS UNTIL FUNDS ARE RECEIVED FROM CUSTOMER OR CUSTOMER'S INTRODUCING BROKER. FCM'S SOLE RESPONSIBILITY PURSUANT TO THIS AGREEMENT IS LIMITED TO THE EXECUTION AND CLEARING OF TRANSACTIONS FOR CUSTOMER'S ACCOUNTS, IN ACCORDANCE WITH INSTRUCTIONS RECEIVED BY FCM FROM CUSTOMER'S AGENT. CUSTOMER'S SOLE RECOURSE IS AGAINST CUSTOMER'S AGENTS. FCM SHALL NOT BE RESPONSIBLE OR LIABLE WHATSOEVER FOR ANY MATTERS RELATING TO CUSTOMERS' AGENT'S COMPLIANCE WITH SALES OR TRADING PRACTICES, RECOMMENDATIONS OR OTHER MATTERS WHETHER AUTHORIZED OR UNAUTHORIZED BY CUSTOMER.

4. Margin. Customer agrees at all times to maintain such margin in Customer's account and sub-account(s) as FCM may from time to time in its sole discretion require, and shall meet all margin calls within the time specified by FCM, by prompt wire-transfer of funds. FCM shall, to the extent practicable under the circumstances, notify Customer of margin calls or deficiencies to allow a reasonable period for Customer to provide funds. Notwithstanding anything in this Agreement to the contrary, if any of Customer's accounts are under-margined, have zero equity or are equity deficit at any time, or in the event FCM is unable to contact Customer due to Customer's unavailability or due to a breakdown in electronic communications, FCM shall have the right in its sole discretion, to liquidate all or any part of Customer's positions through any means available, without prior notice to the Customer. FCM may require margin in excess of that required by applicable law, regulation, exchange or clearinghouse minimums. Customer acknowledges that FCM has no obligation to establish uniform margin requirements among products or customers and that margin requirements may be increased or decreased from time to time in FCM's sole discretion, without advance notice to Customer. Any failure by FCM to call for margin at any time shall not constitute a waiver of FCM's right to do so in the future, nor shall such failure excuse any liability of the Customer. FCM shall not be liable to

17

**INTL FCStone**

Customer for loss of margin deposits, option premiums, or other property, whether due to FCM's liquidation of Customer's account, or if caused, directly or indirectly, by the failure or delay by any custodian, bank, trust company, exchange, clearing organization, other futures commission merchant or clearing broker or other entity that is holding funds, securities, or other property or to pay or deliver the same to FCM. FCM may, for any reason, require Customer to transfer its account(s) to another futures commission merchant. If Customer does not transfer its positions promptly upon demand by FCM, FCM may liquidate the positions and Customer agrees to indemnify and hold FCM harmless from any and all losses, liabilities, costs, claims, damages, expenses, penalty, fine, sanction made or imposed by any regulatory or self-regulatory authority or any exchange or tax or consequential damages ("Losses") resulting from such liquidation. Customer acknowledges that FCM is authorized, to the extent consistent with applicable law, for its account and benefit, from time to time and without notice to Customer, either separately or with others, to lend, repledge, hypothecate or rehypothecate, either to itself or to others, any and all property (including but not limited to cash, securities, commodities warehouse receipts, or other negotiable instruments) held by Customer in any of its accounts and FCM shall not at any time be required to deliver to Customer such identical property but may fulfill its obligation by delivery of property of the same kind and amount.

5. **Treatment of Funds.** An account opened by Customer will have at least 3 sub-allocations on the books of FCM: (i) Customer Segregated, for trades in Commodity Interests listed on U.S. futures exchanges; (ii) Customer Secured, for trades in Commodity Interests on foreign boards of trade; and (iii) Non-Segregated, for deliveries or accounts exempted from Segregated and Secured protections pursuant to the Commodity Exchange Act, as amended ("CEA"). FCM may elect, in its discretion, to establish a Sequestered sub-allocation utilized for swaps that are cleared on a Derivatives Clearing Organization registered with the CFTC. If the Customer has more than one account with FCM and its affiliates, or has a joint account, FCM, in its sole discretion and without prior notice to Customer, may apply or transfer funds from Customer's accounts interchangeably to satisfy margin or reduce any deficit or debit balance in any Customer account. Funds afforded bankruptcy protection pursuant to the CEA will not be transferred or allocated to Customer's Non-Segregated account, unless necessary for margin or to satisfy or reduce any deficit or debit balance in such sub-account.

6. **Limitation of Liability.** In executing transactions on an exchange, FCM will not be responsible to Customer for the error, failure, negligence or misconduct of an independent floor broker, or of any Agent acting on Customer's behalf. FCM has no obligation to investigate the facts surrounding any transaction in Customer's Account(s) which is introduced by Customer's Agent. Customer shall have no claim against FCM for any Loss caused directly or indirectly by (a) governmental, court, exchange, regulatory or self-regulatory organization restrictions, regulations, rules, decisions, or orders, (b) any suspension or termination of trading in Commodity Interests or other instruments, (c) war, civil disturbance or labor disturbance, (d) delay or inaccuracy in the transmission or

reporting of orders due to a breakdown or failure of computer services, transmission, communication or execution facilities, (e) the failure or delay by any exchange or clearinghouse to enforce its rules or to pay to FCM any margin due in respect of Customer's account, (f) the failure or delay by any custodian, bank, trust company, clearing organization, or other entity which is holding Customer funds, securities, or other property to pay or deliver the same to FCM, (g) any other causes beyond FCM's control, such as terrorism or an act of God; (h) as a result of any actions taken by FCM in connection with the exercise of the available remedies pursuant to Section 18 (Liquidation of Accounts) below; or (j) for acts or omissions of those neither employed nor supervised by FCM. FCM shall not be responsible for any Losses except to the extent that Losses are found by a court or arbitration panel to have arisen from FCM's gross negligence or willful misconduct. In no event shall FCM, its agents, or any of its service providers be liable to Customer for consequential, incidental or special damages (including lost profits or trading losses), even if advised of the possibility of such damages.

7. **Indemnification.** Customer agrees to indemnify, defend and hold harmless FCM and its directors, officers, employees, and agents from and against any Losses (including reasonable attorneys' fees) caused directly or indirectly by (a) Customer's failure, breach of, or failure to perform any provision of this Agreement or refusal to fully and timely comply with any provision of this Agreement or applicable law; (b) any actions of any Agent or third party selected by Customer which affect Customer's account; (c) Customer's failure to timely deliver any security, commodity, or other property previously sold by FCM on Customer's behalf, (d) any taxes imposed on FCM on any property held in Customer's accounts; or (e) any misstatement of Customer's representations and warranties contained in this Agreement or any other documentation delivered by Customer to FCM that is untrue or ceases to be true and correct as of the date of this Agreement and for any failure of any transaction executed with respect to Customer's account. Customer additionally agrees to pay promptly to FCM all reasonable attorney's fees incurred by FCM (i) in the enforcement of any of the provisions of this Agreement, or (ii) in any action, claim or demand filed by Customer arising out of this Agreement or any other Agreements between FCM and Customer.

8. **Acknowledgment of Risks.** CUSTOMER HAS READ THE DISCLOSURE STATEMENTS HEREIN, ACKNOWLEDGES THAT COMMODITY INTERESTS INVOLVE TRADING IN HIGHLY LEVERAGED POSITIONS AND POTENTIALLY RAPIDLY FLUCTUATING MARKETS AND MAY RESULT IN RAPID AND SIGNIFICANT LOSSES, WHICH MAY BE IN EXCESS OF ANY MARGIN DEPOSITED BY CUSTOMER. TRADING IN COMMODITY INTERESTS IS HIGHLY SPECULATIVE AND IN NO SENSE MAY BE CONSIDERED A CONSERVATIVE INVESTMENT. BECAUSE THE MARGIN DEPOSITS REQUIRED IN CONNECTION WITH TRADES IN COMMODITY INTERESTS MAY BE RELATIVELY LOW COMPARED WITH THE NOTIONAL VALUE OF THE COMMODITY INTEREST CONTRACT AND VOLATILE PRICE MOVEMENTS CAN OCCUR IN THE MARKETS FOR COMMODITY INTERESTS, THE

POSSIBILITY OF RAPID AND SUBSTANTIAL LOSSES IS CONTINUALLY PRESENT. TRADING IN COMMODITY INTERESTS IS APPROPRIATE ONLY FOR THOSE PERSONS FINANCIALLY ABLE TO WITHSTAND SUBSTANTIAL LOSSES, SOMETIMES GREATLY EXCEEDING THE VALUE OF YOUR MARGIN DEPOSITS. NO ONE (INCLUDING FCM, ANY OTHER FUTURES COMMISSION MERCHANTS, ASSOCIATED PERSONS, IBs OR GIBS, FUND MANAGERS, COMMODITY TRADING ADVISORS OR COMMODITY POOL OPERATORS) CAN GUARANTEE PROFITS OR THE ABSENCE OF LOSSES. CUSTOMER AGREES TO PROMPTLY NOTIFY FCM COMPLIANCE IF ANY SUCH GUARANTEE IS SUGGESTED BY CALLING (312)780-6700 or (816)410-7157.

9. Debit Balances, Commissions and Other Costs. Customer agrees to pay, and authorizes, FCM to debit its account for, (i) the amount of any trading loss, debit balance or deficiency in any of Customer's accounts; (ii) all FCM commissions and other charges in effect from time to time, (iii) all commissions, fees and other costs incurred in connection with Commodity Interests executed, carried and/or cleared by FCM, including but not limited to, introducing broker and floor brokerage, clearing, exchange and  National Futures Association ("NFA") fees, (iv) all costs incurred by FCM in connection with taking and/or making deliveries, and (v) all regulatory, exchange and other self-regulatory fees, fines, penalties and charges, and any taxes incurred or imposed with respect to Commodity Interests or other transactions in  or for Customer's accounts and any other service-related fees charged to Customer's account, including, but not limited to, wire transfer fees, statement fees and transaction fees. If Customer's account is transferred to another futures commission merchant, transfer commissions and/or service fees may be charged. Customer agrees that all demands for debits owing FCM shall be met within twenty-four (24) hours following either of (i) Customer's receipt of FCM's oral request for payment or (ii) FCM's delivery to Customer of FCM's written request for payment (except as payment may be modified with respect to wire and telephone requests for margin funds). If, after such 24 hour period the amount in Customer's account is not sufficient to pay outstanding fees and FCM deems it necessary to take collection action, Customer shall hold FCM harmless for all Losses incurred in connection with such collection and shall reimburse FCM for the debit and all costs incurred, including reasonable attorneys' fees, in connection with such collection actions.  Customer agrees to pay interest on debits and deficiencies at an annual rate of 1% over the prime rate as published by the Wall Street Journal on the date such debit or fee was incurred or other rates as negotiated.

10. Investment of Client Funds. FCM may invest Customer's funds in instruments described in accordance with CFTC Regulation 1.25. In accordance with CFTC Regulation 1.29, FCM may receive and retain as its own, any increment or interest resulting from the investment of the funds held in the Customer's account. FCM shall be under no obligation to pay or account to Customer for any interest income or benefits that may be derived from or use of client monies, reserves, deposits, cash equivalents or any other property. FCM shall bear sole responsibility for any losses resulting from the investment of customer funds in instruments described in CFTC Regulation 1.25. No investment losses shall be borne or otherwise allocated to the Customer.

11. Collateral; Security Interest. To secure payment of all obligations of Customer to FCM, Customer grants  FCM a security interest in all monies, securities, negotiable instruments, open positions in Commodity Interests and all receipts of other documents representing underlying commodities, including without limitation warehouse receipts, and all commodities represented by such receipts or other documents or other property now or at any future time, including all proceeds thereof, held in one or more of Customer's accounts or which may be in FCM's possession for any purpose, including safekeeping ("Collateral"). All Collateral which FCM may at any time be carrying for Customer (either individually, jointly with others or as a guarantor of the account of another person) or which at any time may be in FCM's possession or control or carried on its books for any purpose including safekeeping, are to be held by FCM as security and subject to the general lien and right of set-off for all liabilities of Customer to FCM or any affiliate of FCM. FCM shall have all the rights and remedies available to a secured party under applicable law with respect thereto. FCM may at any time, in its sole and absolute discretion without notice to Customer, liquidate Collateral posted by Customer in order to  satisfy any margin or account deficiencies of Customer or any person guaranteed by Customer, including but not limited to debit or deficit balances resulting  from transactions executed by FCM for Customer, interest charges, service charges, expenses incurred by FCM, including court costs and attorney's fees incurred in collecting debit or deficit balances of Customer in any account and FCM may transfer Collateral to the general ledger account of FCM or pledge, transfer, or lend such Collateral, all without liability on the part of FCM to Customer or any third party. Customer agrees to execute any and all documents, including Uniform Commercial Code financing statements, deemed necessary or advisable by FCM to evidence or perfect such security interest.  Absent written consent of FCM, Customer will not cause or allow any Collateral on deposit with FCM to become subject to any lien, security interest, mortgage or other encumbrance in favor of any person other than FCM.

12. Deliveries.  Customer understands that, unless the contract specifications state to the contrary, every Commodity Interest contract contemplates delivery and Customer shall promptly advise FCM whether or not Customer intends to make or take delivery. Customer agrees to deliver to FCM, at least two business days prior to the delivery date, any commodity or property, or documents representing ownership of same (including but not limited to warehouse receipts), previously sold by FCM on Customer's behalf, which FCM in its sole and absolute discretion deems necessary to effect a good delivery pursuant to the rules and delivery procedures of the contract market on which the delivery is contemplated. If at any time Customer shall be unable to deliver to FCM any commodity or other property previously sold by FCM on Customer's behalf, Customer authorizes FCM, in FCM's sole discretion, to borrow or buy and delivery the same, and Customer shall immediately

INTL FCStone

pay and indemnify FCM for any Losses which FCM may sustain from its inability to borrow or buy any such security, commodity or other property. In the event FCM takes delivery of any property or commodity for Customer's account, Customer agrees to indemnify and hold FCM harmless from and against any Loss it may suffer resulting, directly or indirectly, from any decline in value of said security, commodity or other property. If Customer takes delivery of commodities through futures contracts, FCM is obligated to make full payment for the delivery on 24 hours' notice. If the balance in Customer's account is not adequate to pay for the delivery, the delivered commodity (or warehouse receipts or other documentation representing the delivery) becomes property carried on margin in Customer's account, since they are not fully paid for by Customer. FCM may use such property as collateral for a bank loan, the proceeds of which are used to pay for the property until re-delivery of the property and payment in full by Customer. Customer acknowledges that making or accepting delivery pursuant to a futures contract may involve a much higher degree of risk than liquidating a position by offset. FCM has no control over and makes no warranty with respect to grade, quality, or tolerances of any commodity delivered in fulfillment of a contract.

13. **Positions and Reporting.** Customer acknowledges Customer's reporting obligations regarding certain sized positions under CFTC Regulations, including the obligation to complete Form 40, Form 204, or other reports required by the Commodity Futures Trading Commission ("CFTC") from time to time. Customer agrees FCM may, at its discretion, establish trading limits for Customer's account and may limit the number of open positions (net or gross) which Customer may execute, clear or carry through FCM. Customer agrees (i) not to enter into any trade which would have the effect of exceeding any position limits established by FCM, the CFTC or any regulatory or self- regulatory agency including any designated contract market or clearinghouse, (ii) FCM may require Customer to reduce open positions carried with FCM, and (iii) FCM may refuse to accept orders to establish new positions. FCM may impose and enforce such limits or reductions in positions and may reject a trade, whether or not required by applicable law, regulations, or exchange rules. Customer shall notify FCM promptly if Customer is required to file position reports with any regulatory or self-regulatory organization or with any exchange and agrees to provide FCM with copies of any such report. FCM expressly disclaims any liability for Customer's Losses related to Customer's exceeding applicable limits. Approval for hedge margins does not exempt an account from speculative positions limits. To be exempt from speculative position limits requires application and approval of a hedge exemption from the CFTC and the contract's respective exchange.

14. **Market Information.** Customer acknowledges that (a) any market information communicated to Customer does not constitute an offer to sell or the solicitation of an offer to buy any Commodity Interest; (b) such information, although based upon information obtained from sources believed to be reliable, may be incomplete and unverified; and (c) FCM makes no representation, warranty, recommendation or guarantee as to, and shall not be

responsible for the accuracy of completeness of, any information furnished to Customer. Customer understands that FCM and its affiliates or representatives may have a position in and may intend to buy or sell Commodity Interests which are the subject of information furnished to Customer, and that the market position of FCM or any such affiliate or representative may or may not be consistent with the information furnished to Customer by FCM or any of its affiliates or representatives. Further, FCM its affiliates, and exchanges on which FCM may trade on behalf of Customer, may provide research or other market information as trading tools. Customer acknowledges that: (a) any information FCM's research department may communicate to Customer does not constitute an offer to sell or a solicitation of any offer to buy any Commodity Interest; (b) such research reports and information, although based upon information obtained from sources believed by FCM to be reliable, are incidental to FCM's business as a futures commission merchant, may be incomplete and are not subject to verification, and should not serve as the primary basis for any trading decision by Customer; (c) FCM makes no representation, warranty, or guarantee as to, and shall not be responsible for, the accuracy or completeness of any research report or other information furnished to Customer; (d) recommendations to Customer as to any particular transaction at any given time may differ among FCM's personnel due to diversity in analysis of fundamental and technical factors and may vary from any standard recommendation made by FCM in its market letters or otherwise; and (e) FCM has no obligation or responsibility to update any market recommendations or information it communicates to Customer. Customer understands that FCM and its officers, directors, affiliates, stockholders, representatives, or associated persons may have positions in and may intend to buy or sell Commodity Interests which are the subject of market recommendations furnished to Customer, and that the market positions of FCM or any such officer, director, affiliate, stockholder, representative, or associated person may or may not be consistent with the recommendations furnished to Customer by FCM.

15. **Government and Exchange Rules.** All transactions under this Agreement shall be subject to the applicable constitution, rules, regulations, customs, usages, rulings and interpretations of the exchanges, clearing houses or markets on which such transactions are executed by FCM for Customer's account, the NFA and CEA rules and regulations and any other applicable rules and regulations. FCM shall not be liable to Customer as a result of the foregoing rules and any failure by FCM or its agents to comply with any of the foregoing rules does not relieve Customer of its obligations under this Agreement or create rights under this Agreement in favor of Customer. If any rule or regulation is hereafter adopted by any governmental authority exchange, board of trade, clearing house, or self-regulatory organization which shall be binding upon FCM or any exchange clearing member firm selected by FCM and shall operate inconsistently with any of the provisions hereof, the affected provisions of this Agreement shall be deemed modified or superseded as the case

INTL FCStone

may be, by applicable provisions of such rule, or regulation and all other provisions of this Agreement and provisions so modified shall in all respects continue in full force and effect.

16. Clearing. Unless otherwise specified, FCM is authorized to execute such orders upon any exchange or other trading facility which may be deemed by FCM, in its sole discretion, to be appropriate, including another exchange clearing member firm selected by FCM, either via an omnibus clearing arrangement or on a fully disclosed basis. All rights and obligations extended to FCM pursuant to this Agreement, and all other provisions of this Agreement shall also become applicable to such exchange clearing member firm.

17. Termination. This Agreement may be terminated by FCM or the Customer immediately upon written notice to the other party. FCM reserves the right to terminate any Customer account at any time, for any reason. In the event of such termination, Customer shall immediately liquidate positions in Customer's account(s), or transfer such open Commodity Interest positions to another futures commission merchant. The termination of this Agreement shall not affect the obligations of the parties arising from transactions entered into prior to such termination. Notwithstanding any termination, Customer shall satisfy all liabilities to FCM arising, hereunder (including, but not limited to, payment of applicable debit balances, commissions and fees, including fees with respect to the transfer of positions to another FCM). In the event of Customer's bankruptcy proceedings, death, incompetence, dissolution, or failure to provide adequate margin, FCM is authorized to terminate Customer's account without prior notice to Customer.

18. Liquidation of Accounts. In the event of (a) Customer's death or, in the case of a joint account, the death of the last survivor thereof; (b) a decision by Customer that is an entity to dissolve or liquidate; (c) any representation made by Customer is not or ceases to be accurate and complete in any material respect; (d) Customer defaults on any obligations to FCM hereunder or otherwise in respect of any transaction or Agreement; (e) a case in bankruptcy is commenced or a proceeding under any insolvency or other law for the protection of creditors or for the appointment of a receiver, trustee or similar officer is filed by or against Customer, or Customer makes or proposes to make any arrangement or composition for the benefit of its creditors, or Customer or any of its property is subject to any agreement, order or judgment of dissolution, liquidation, reorganization or the appointment of a receiver, trustee or similar officer; or (f) Customer fails to deposit or maintain required margin or, fails to pay required premiums or fails to make any other payments required hereunder or otherwise in respect of any Commodity Interest; or (g) FCM, for any reason whatsoever, deems itself insecure or if necessary for FCM's protection (each of (a) through (g) an "Event of Default"), then FCM is hereby authorized, in its sole discretion, to (i) sell any or all of the Commodity Interests or other property of Customer which may be in FCM's possession, or which FCM may be carrying for Customer, (ii) buy-in any Commodity Interest or other property of which the account or accounts of Customer may be short or (iii) cancel any

outstanding orders, in each case in order to close out the account or account of Customer in whole or in part or in order to close out any commitment made on behalf of Customer. Such sale, purchase or cancellation may be made according to FCM's sole discretion, on the exchange or other market where such business is usually transacted, including any Exchange of Futures for Risk transaction, without notice to Customer, its Agent or legal representative and FCM may purchase the whole or any part thereof free from any right of redemption, and Customer shall remain liable for any deficiency, it being understood that a prior tender, demand or call of any kind, from FCM, or prior notice from FCM, of the time or place of such sale or purchase shall not be considered a waiver of FCM's rights to sell or buy any Commodity Interests or other property held by FCM or owned by Customer, at any time as hereinbefore provided or to be deemed to require any such tender, demand, call or notice on any subsequent transaction. Further, FCM may, at its option, cause a whole or partial liquidation of Customer's account or the straddling of existing open positions in the event they cannot be satisfactorily liquidated because the market is up or down the limit. In addition, upon the occurrence of an Event of Default, FCM may treat any or all of Customer's obligations due FCM as immediately due and payable, and set off any obligations of FCM to Customer against any obligations of Customer to FCM, and may sell any Collateral or other property deposited with FCM and apply such Collateral or property to any obligations of Customer to FCM, all without any liability on the part of FCM to Customer, or any third party. Any of the above actions may be taken without demand for margin or additional margin, without prior notice of sale or purchase or other notice or advertisement to Customer, its Agent, personal representatives, heirs, executors, administrators, legatees, or assigns, regardless of whether the ownership interest shall be solely Customer's account or held jointly with others. In all cases Customer shall be liable to pay any deficiency remaining in each account after any such action is taken, together with interest thereon and all costs relating to liquidation and collection including reasonable attorneys' fees.

19. Notices and Reports. Customer hereby consents to the delivery of any required or optional communication under this Agreement or under any applicable law, including any changes in the terms and conditions of this Agreement, by e-mail, website or other electronic means, subject to compliance with any applicable laws. Any such documents that are delivered electronically are deemed to be "in writing." If a signature or acknowledgment is required or requested with respect to any such document and Customer "clicks" in the appropriate space, or takes such other action as may be indicated in such communication, Customer will be deemed to have signed and acknowledged the contents of such document to the same extent and with the same effect as if Customer had signed the document manually. Customer acknowledges that it has the right to withdraw its consent to the electronic delivery and signature of documents at any time by providing prior written notice to FCM. If Customer revokes its consent, FCM may exercise its right

**INTL FCStone**

to terminate this Agreement in accordance with Section 17. Customer shall deliver all notices and communications to FCM'S executive office located at INTL FCStone Financial Inc., FCM Division, Suite 10-500, 230 South LaSalle Street, Chicago, Il, 60604, and Attention: Compliance Dept. Customer agrees to immediately open, read and act on all communications sent by FCM. Information sent by electronic mail shall be deemed received by Customer by 10:00 a.m. (Central Time) the next business day after FCM sends the electronic mail. Information and notices posted on FCM's website shall be deemed received by Customer by 10:00 a.m. (Central Time) the next business day after FCM posts such information and notices on its website. Customer shall promptly notify FCM of any difficulty in accessing, opening or otherwise viewing any electronically transmitted document or information. Confirmations of trades, statements of account, margin calls, and any other written notices shall be binding on Customer for all purposes. Reports of executions and all statements of account rendered by FCM from time to time to Customer shall be conclusively deemed correct and final, unless Customer calls any error therein to FCM's attention in writing (a) prior to the start of business on the next business day following receipt thereof, in the case of margin calls and confirmations and (b) within 5 days receipt thereof, in the case of statements of account and any other written notices or demands (other than trade confirmations or margin calls). FAILURE TO NOTIFY FCM SHALL BE DEEMED RATIFICATION OF ALL ACTIONS TAKEN BY FCM OR FCM'S AGENT AS DESCRIBED IN SUCH NOTIFICATION. FCM SHALL NOT BE LIABLE TO CUSTOMER FOR SUCH RELIANCE AND SHALL BE RELIEVED OF ANY RESPONSIBILITY WHATSOEVER RELATIVE TO THE TRANSACTION(S) IN QUESTION. Customer agrees that in the event of a discrepancy in the status of Customer's account, Customer will take reasonable measures to rectify such discrepancies. In the event that a discrepancy is determined by FCM to be due solely to FCM's error, FCM agrees to credit Customer's account for the discrepancy; provided, however, that Customer has taken reasonable measures to correct such discrepancy as set forth above. FCM shall not be responsible for any amount unrealized or any loss to Customer's account due to Customer's failure to take reasonable measures to correct any account discrepancy. These provisions shall not prevent FCM, upon discovery of any error or omission, from correcting such error or omission. The Parties agree that such errors, whether resulting in profit or loss, will be corrected in Customer's account and will be credited or debited so that it is in the same position it would have been in if the error had not occurred. Whenever a correction is made, FCM will promptly make written notification to Customer.

20. Amendment. Failure of FCM to enforce any provision of this Agreement shall not be construed to be a waiver of such provision or affect the validity of this Agreement or the right of FCM thereafter to enforce each provision hereof. No waiver of any breach of this Agreement shall constitute a waiver of any other or subsequent breach. No waiver or amendment shall be implied from any action or inaction. This Agreement may be modified or amended by FCM from time to time by written notice to Customer. If Customer does not consent to modification or amendment,

Customer's sole right will be to terminate this Agreement. No other modification or amendment this Agreement shall be effective unless agreed to in writing and signed by each Party.

21. Assignment. FCM may assign the Customer's account or accounts to another registered futures commission merchant by notifying Customer of the date and name of the intended assignee futures commission merchant (10) days prior to the assignment, to the extent practicable under the circumstances. Unless Customer objects in writing within 2 business days of receipt of FCM notice, the assignment will be binding on the Customer. This Agreement, including all authorizations shall inure to the benefit of FCM, its successors and assigns whether by merger, consolidation or otherwise, irrespective of any change in the FCM's personnel, and shall be binding upon Customer and Customer's personal representatives, executors, trustees, administrators, successors and assigns.

22. Further Representations. Customer represents and warrants that:

a. Customer, if an individual, is of legal age and Competence to enter into this Agreement and that transactions in Commodity Interests as contemplated by this Agreement are suitable and appropriate for Customer and consistent with Customer's investment objectives;

b. Customer, if a legal entity, is duly organized, validly existing, and empowered to enter into this Agreement, to establish the account, to enter into transactions in Commodity Interests as contemplated hereby and that such transactions are suitable and appropriate for Customer and do not violate any of Customer's constituent documents or any law applicable to Customer. Customer further represents that the person executing this Agreement on its behalf has been duly and validly authorized to do so;

c. Neither Customer nor any partner, director, officer, member, manager, or employee of Customer nor any affiliate of Customer is a partner, director, officer, member, manager, or employee of a futures commission merchant, broker-dealer, introducing broker, or regulatory of self-regulatory organization except as disclosed in the FCM Account Application accompanying this Agreement or otherwise provided in writing. Customer is not a commodity pool operator or is exempt from registration as a commodity pool operator under CFTC rules. Customer is acting solely as principal and no one other than Customer has any interest in any account(s) of Customer. Customer agrees to notify FCM of the identity of any Agent or other person or entity that controls trading of the account(s), has a financial interest of 10% or more in the account or the identity of any other account(s) in which the Customer controls or has a 10% or greater ownership interest;

d. If Customer's account(s) is designated as a "hedge account", and unless Customer notifies FCM to the contrary at the time it places an order with FCM, Customer represents that each order will be a bona fide hedging transaction as defined in CFTC Regulations, as such regulations may be amended from time to time.

22

**INTL FCStone**

e. Customer shall maintain its account(s) in accordance with and shall be solely responsible for, compliance with laws, rules, regulations and guidelines issued by federal, state or administrative bodies having oversight or regulatory authority over its activities;

f. Customer is capable of assuming the risks of trading Commodity Interests and has determined that trading in Commodity Interests is suitable and appropriate for Customer, is prudent in all respects and does not and will not violate Customer's charter or by-laws (or other comparable governing document) or any law, rule, regulation, judgment, decree, order, or agreement to which Customer or its property is subject or bound;

g. As required by CFTC regulations, Customer shall create retain and produce upon request of the applicable contract market, the CFTC or the United States Department of Justice, documents, such as contracts, confirmations, telex printouts, invoices, and documents of title with respect to cash commodities or exchanges of futures in connection with cash commodity transactions;

h. Absent a separate written agreement between Customer and FCM with respect to give-ups, FCM, in its discretion, may, but shall have no obligation to, accept from other brokers contracts executed by such brokers on an exchange for Customer and proposed to be "given up" to FCM for clearance and/or carrying in the account; if FCM does accept such Commodity Interests, Customer authorizes FCM to pay and charge to Customer's account any give-up or give-in fee that may be charged by any exchange or clearing house or by executing firm or broker whom Customer or its agents have authorized to execute transactions for Customer's account;

i. If Customer is subject to the Financial Institution Reform, Recovery and Enforcement Act of 1989, the certified resolutions set forth following this Agreement have been caused to be reflected in the minutes of Customer's Board of Directors (or other comparable governing body) and this Agreement is and shall be, continuously from the date hereof, an official record of Customer;

j. The Account Application executed by Customer in connection with this Agreement (including any financial statements furnished in connection therewith) is true, correct, and complete and Customer has never been suspended or barred from trading Commodity Interests by the CFTC, or similar regulatory agency or any predecessor agency or other federal or state regulatory agency, exchange or trade association. Customer shall notify FCM in writing within (2) two business days if any of the warranties and representations contained herein becomes inaccurate or in any way ceases to be true or complete.

**23. Trading Representations.** Customer understands that on certain trading days, trading in certain commodities, commodity options, leverage contracts and underlying commodities or futures contracts may cease or expire. With respect to commodity options and underlying commodities or futures contracts traded outside the United States, trading days and hours may not coincide with domestic trading days or hours, which may result in financial disadvantage to Customer. Customer shall hold FCM, FCM's employees, officers, partners, agents and GIB's harmless against such loss.

**24. Verification.** Customer authorizes FCM to contact banks, financial institutions and credit agencies as FCM shall deem appropriate from time to time to verify information provided by Customer from time to time. Customer understands an investigation may be made pertaining to Customer's personal and business credit standing. Customer may make written request within a reasonable time for disclosure of such investigation.

**25. Conversion Rate Risk.** If FCM is directed to enter into any Commodity Interest contract on any exchange or board of trade involving transactions effected in a foreign currency, any profit or loss arising from fluctuation in the rate of exchange affecting such currency will be entirely for Customer's account and risk. FCM has the sole discretion to convert funds in Customer's account into and from such foreign currency at a rate of exchange determined by FCM as it deems necessary and proper and on the basis of then prevailing money markets.

**26. Telephone Recording.** Customer consents to the recording of Customer's telephone conversations with FCM or any of its agents or associated persons by means of electronic recording devices with or without the use of an automatic tone warning device. Customer authorizes and consents to the use of such recordings, and transcripts thereof, as evidence by either party in any action arising out of this Agreement. FCM may, but shall not be required, in its normal course of business, to erase such recordings following their production.

**27. Offsetting Positions.** If Customer maintains separate accounts in which, pursuant to CFTC Regulation 1.46, offsetting positions are not closed out, FCM hereby advises Customer that (if held open) offsetting long and short hedge positions in the separate accounts may result in additional fees and commissions and payment of additional margin, although offsetting positions will result in no additional market gain or loss.

**28. Governing Law; Consent to Jurisdiction.** Customer acknowledges this Agreement is governed by the Laws of the State of Illinois. Customer hereby submits and consents to the jurisdiction of the Courts of the State of Illinois and, shall be amenable to service of summons and other legal process of, and emanating from, the State of Illinois. Customer expressly waives the right to the adjudication or enforcement of such controversies by any court or any other tribunal sitting in any other jurisdiction, and further expressly waives the provisions of any statute or administrative ruling defining a commodity or commodity contract to be a security. CUSTOMER AGREES CONTROVERSY BETWEEN FCM AND CUSTOMER ARISING OUT OF THIS AGREEMENT, REGARDLESS OF THE MANNER OF RESOLUTION, SHALL BE ARBITRATED OR LITIGATED IN A COURT OF LAW OR OTHERWISE RESOLVED BY A TRIBUNAL LOCATED IN CHICAGO, ILLINOIS. CUSTOMER HEREBY WAIVES TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDING

**INTL FCStone**

29. Agreement to Shorten Statutes of Limitations. FCM and Customer agree that no action in law, equity, arbitration or administrative proceeding arising out of any transactions effected pursuant to this Agreement or the relationship of Customer with FCM, may be commenced more than one (1) year after either Party knew or should have known a cause of action existed. Customer expressly waives the two (2) year statute of limitations provided by the CEA, including the two year time period for commencing a CFTC reparation proceeding, and any and all other applicable statutes of limitations exceeding one (1) year, including but not limited to, any statutory or common law state or federal statute of limitations, the statute of limitations provided by the NFA for commencing an arbitration action, and the statute of limitations for initiating arbitrations before registered contract markets. Customer's agreement with this provision is not a condition to, or necessary to open an account with FCM.

30. Joint Accounts. If this is a joint account, the Customers agree, jointly and severally, that this Agreement and all matters contained herein are the joint and several rights and obligations of the Customer. Each of the Customers has the authority to act on behalf of the joint account as if he or she alone were interested therein, all without notice to the others interested in said account, including, but not limited to, conferral or revocation of authority hereunder. All property of any one or more of the Customers held or carried by FCM shall be as Collateral and security and with a general lien thereon for the payment of all debits, losses or expenses incurred in the joint account and vice versa, however arising. In the event of death or legal incapacity of any of the Customers, the survivor(s) immediately shall give FCM notice and FCM may, before or after receiving such notice, take such action, require such documents, retain such assets and restrict transactions as FCM deems advisable to protect FCM. Liability of the Customer hereunder shall pass to any estate or personal representative of the Customer. This joint account can be with or without the right of survivorship. "Without rights of survivorship" means upon death of any of the Customers the FCM will divide the joint account into separate equal accounts in each of the Customers' respective names, but surviving Customers shall continue to be liable on the joint account here under until FCM has received actual notice of such death or incapacity. If no instruction is given, Customers are deemed Joint Tenants with Full Rights of Survivorship.

31. Trading Hours; Execution of Options. Customer understands that on certain trading days, trading in certain commodities, commodity options, leverage contracts and underlying commodities or futures contracts may cease or expire and with respect to commodity options and underlying commodities or futures contracts traded outside the United States, trading days and hours may not coincide with domestic trading days or hours, which may result in financial disadvantage to Customer. FCM will not be responsible for, and Customer agrees to hold FCM and its affiliates harmless from any Losses associated with such disadvantage.

32. Terms and Headings. The term "FCM" shall be deemed to include

the FCM Division of INTL FCStone Financial Inc., its successors and assigns; the term "Customer" shall be deemed to refer to the Party(s) executing this Agreement. All pronouns shall be deemed to refer to the feminine or the masculine as the gender of Customer requires. If this is a joint account, the singular shall mean, where appropriate, all owners of an account and the statements, agreements, representations and warranties set forth herein shall be deemed to have been made by each account owner. The paragraph headings in this Agreement are inserted for convenience only and are not intended to limit the applicability or affect the meaning of any provisions.

33. Disclosure Statement for Non-Cash Margin. This statement is furnished to you because CFTC Rule 190.10(C) requires it for reasons of fair notice unrelated to FCM's current financial condition. You should know that in the unlikely event of FCM's bankruptcy, property, including property specifically traceable to you, will be returned, transferred or distributed to you, or on your behalf, only to the extent of your pro rata share of all property available for distribution to customers. Notice concerning the terms for the return of specifically identifiable property will be by publication in the newspaper of general circulation. The CFTC's regulations concerning bankruptcies of commodity brokers can be found at Title 17 of Code of Federal Regulations Part 190.

34. Electronic Trading and Order Routing Systems. Customer acknowledges that electronic trading and order routing systems differ from traditional open-outcry pit trading and manual order routing methods. Transactions using an electronic system are subject to the rules and regulations of the exchange(s) offering the system and listing the contract, and such rules may change from time to time. Customer further acknowledges that trading or routing orders through electronic systems may present risk factors including, but not limited to, system access, varying response times, and security. In the case of Internet-based systems, there may be additional types of risks related to internet service providers and the receipt and monitoring of electronic mail and other communications. CUSTOMER AGREES TO INDEMNIFY FCM AND HOLD FCM HARMLESS FROM AND AGAINST ANY AND ALL LIABILITIES, LOSSES, DAMAGES, COSTS AND EXPENSES, INCURRED DIRECTLY OR INDIRECTLY, DUE TO FAILURE OF SYSTEM ACCESS, VARYING RESPONSE TIMES, SECURITY, SYSTEM OR COMPONENT FAILURE, THE INABILITY TO ENTER NEW ORDERS, EXECUTE EXISTING ORDERS, OR MODIFY OR CANCEL ORDERS THAT WERE PREVIOUSLY ENTERED AND/OR LOSS OF ORDERS OR ORDER PRIORITY.

35. Electronic Signature and Acknowledgement. Customer shall ratify and execute documents manually and by use of an electronic signature. Electronic signature shall have the same legal effect as a manual signature. The use of an electronic signature by the Customer and the acceptance of Customer's electronic signature by FCM shall occur pursuant to the Federal

24

**INTL · FCStone®**

Electronic Signatures in Global and National Commerce Act, the Uniform Electronic Transactions Act, the Illinois Electronic Commerce Security Act and any applicable rules and regulations of the CFTC. Customer acknowledges that his or her funding of the commodity trading account(s) or submission of commodity trades to FCM, whichever shall first occur, shall be deemed ratification of the terms of the account, this Agreement and all related documents. Customer attests that if Customer has downloaded this Agreement from the internet or any electronic message, Customer has printed it directly from the PDF or other electronic field provided by FCM without modification.

**36. Printed Media Storage.** Customer acknowledges and agrees that FCM may reduce all documentation evidencing Customer's account, including the original signed documents executed by Customer in the opening of such Customer's account with FCM, utilizing a printed media storage device such as micro-fiche or optical disc imaging. Customer agrees to permit the records stored by such printed media storage method to serve as a complete, true and genuine record of such Customer's account documents and signatures.

**37. Options Trading.** Customer understands that some exchanges and clearing houses have established cut-off times for the tender of exercise instructions and that an option will become worthless if instructions are not delivered before such expiration time. Customer also understands that certain exchanges and clearing houses automatically will exercise some "in-the-money" options unless instructed otherwise. Customer acknowledges full responsibility for taking action either to exercise or to prevent the exercise of an option contract, as the case may be, and FCM

is not required to take any action with respect to an option contract, including without limitation any action to exercise a valuable option prior to its expiration date or to prevent the automatic exercise option, except upon Customer's express instructions. Customer further understands the FCM has established exercise cut-off times which may be different from the times established by exchanges and clearing houses. Further, Customer understands that (i) all short option positions are subject to assignment anytime including positions established on the same day that exercise are assigned, and (ii) exercise assignment notices are allocated randomly from among all FCM Customers' short options positions which are subject to exercise. A Detailed description of FCM's allocation procedure is available upon request.

**38. Trading Limitations.** FCM, at any time, in its sole discretion may limit the number of contracts of positions and/or the margin in use which the Customer may maintain or acquire through FCM. Customer agrees not to exceed the positions limits established by the CFTC or any contract market and/or limits of the number of contracts or positions and/or the margin in use set by FCM, whether acting alone or with others.

**39. Severability.** If any provision of this Agreement shall be prohibited by, or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

**40.** Customer has read and understands the entirety of this Agreement and has independently concluded that transactions in futures and exchange-traded options are suitable and appropriate for Customer.

| Individual - Joint Account Holders - Sole Proprietorship | Corporation, Partnership, Limited Liability Company, Trust: (All General Partners sign) |
|---|---|
| Paul Yoon | |
| Print Customer Name | Print Customer Entity Name |
| | |
| | Print Signatory Name |
| Signature: _____ Date: 15 / 02 / 2018 | |
| Day Month Year | Print Signatory Name |
| | Title |
| | Signature: _____ Date: __ / __ / __ |
| | Day Month Year |
| Print Joint Customer Name | Print Signatory Name |
| | Title |
| Signature: _____ Date: __ / __ / __ | Signature: _____ Date: __ / __ / __ |
| Day Month Year | Day Month Year |

25

**INTL·FCStone®**

## ARBITRATION AGREEMENT

Any controversy or claim arising out of or relating to your accounts shall be settled by arbitration, either (1) under the Code of Arbitration of the National Futures Association, or (2) upon the contract market on which the disputed transaction was executed or could have been executed. Any award rendered thereon by the arbitrators, shall be final and binding on each and all of the parties thereto and their personal representatives and judgment may be entered in any court having jurisdiction thereof. At the time you notify either the FCM Division of INTL FCStone Financial Inc. ("FCM") or your Introducing Broker of your intent to submit a claim to arbitration, or at such time that you are notified of the FCM or an Introducing Broker's intent to submit a claim to arbitration, you will have an opportunity to elect a qualified forum for conducting the proceedings, and will be supplied with a list of qualified organizations. You are required to send notice of your intent to arbitrate by certified mail to the FCM and/or the Introducing Broker at their respective addresses, and the Secretary of the National Futures Association.

THREE FORUMS EXIST FOR THE RESOLUTION OF COMMODITY DISPUTES: CIVIL COURT LITIGATION, REPARATIONS AT THE COMMODITY FUTURES TRADING COMMISSION (CFTC) AND ARBITRATION CONDUCTED BY A SELF-REGULATORY OR OTHER PRIVATE ORGANIZATION. THE CFTC RECOGNIZES THAT THE OPPORTUNITY TO SETTLE DISPUTES BY ARBITRATION MAY IN SOME CASES PROVIDE MANY BENEFITS TO CUSTOMERS, INCLUDING THE ABILITY TO OBTAIN AN EXPEDITIOUS AND FINAL RESOLUTION OF DISPUTES WITHOUT INCURRING SUBSTANTIAL COSTS. THE CFTC REQUIRES, HOWEVER, THAT EACH CUSTOMER INDIVIDUALLY EXAMINE THE RELATIVE MERITS OF ARBITRATION AND THAT YOUR CONSENT TO THIS ARBITRATION AGREEMENT BE VOLUNTARY. BY SIGNING THIS ARBITRATION AGREEMENT, YOU: (1) MAY BE WAIVING YOUR RIGHT TO SUE IN A COURT OF LAW; AND (2) ARE ARGEEING TO BE BOUND BY ARBITRATION OF ANY CLAIMS OR COUNTERCLAIMS WHICH YOU, THE FCM OR THE INTRODUCING BROKER MAY SUBMIT TO ARBITRATION UNDER THIS AGREEMENT. YOU ARE NOT, HOWEVER, WAIVING YOUR RIGHT TO ELECT INSTEAD TO PETITION THE CFTC TO INSTITUTE REPARATIONS PROCEEDINGS UNDER SECTION 14 OF THE COMMODITY EXCHANGE ACT ("CEA") WITH RESPECT TO ANY DISPUTE WHICH MAY BE ARBITRATED PURSUANT TO THIS ARGREEMENT. IF A DISPUTE ARISES, YOU WILL BE NOTIFIED IF THE FCM OR THE INTRODUCING BROKER INTENDS TO SUBMIT THE DISPUTE TO ARBITRATION. IF YOU BELIEVE A CEA VIOLATION IS INVOLVED AND YOU PREFER TO REQUEST A SECTION 14, "REPARATIONS" PROCEEDING BEFORE THE CFTC, YOU WILL HAVE 45 DAYS FROM THE DATE OF SUCH NOTICE IN WHICH TO MAKE THAT ELECTION. IF YOU SEEK REPARATION PROCEEDINGS BEFORE THE CFTC AND THE CFTC DECLINES TO INSTITUTE THOSE PROCEEDINGS, OR IF CERTAIN ASPECTS OF THE CLAIM OR GRIEVANCE ARE NOT SUBJECT TO REPARATION PROCEEDINGS, THE CLAIM OR GRIEVANCE, OR PART THEREOF, WILL BE SUBJECT TO THIS ARBITRATION AGREEMENT.

YOU NEED NOT SIGN THIS AGREEMENT TO OPEN AN ACCOUNT WITH THE FCM AND/OR THE INTRODUCING BROKER. SEE 17 CFR 180.1-180.5.

| Individual - Joint Account Holders - Sole Proprietorship | Corporation, Partnership, Limited Liability Company, Trust: (All General Partners sign) |
|---|---|
| PAUL YOON | |
| Print Customer Name | Print Customer Entity Name |
| | Print Signatory Name |
| *[signature]* Date: 15 / 02 / 2018 | |
| Signature    Day  Month  Year | Title |
| | Signature    Date: ___ / ___ / ___ Day Month Year |
| Print Joint Customer Name | Print Signatory Name |
| | Title |
| Signature    Date: ___ / ___ / ___ Day Month Year | Signature    Date: ___ / ___ / ___ Day Month Year |

26

**INTL · FCStone**

## REQUEST FOR ELECTRONIC TRANSMISSION OF CUSTOMER STATEMENTS

Upon receipt of Customer's consent, the FCM Division of INTL FCStone Financial Inc. acting in its capacity as a futures commission merchant ("FCM"), will provide daily confirmations, purchase and loss statements and monthly statements of activity (collectively, "Statements") by electronic transmission to the email address indicated below and will no longer mail hard copies of such statements. Customer confirms that the recipient of emails at the address specified below will promptly review the relevant Statements in the form transmitted by FCM. Customer acknowledges its understanding that there is a risk of failure of any electronic transmission, and will not hold FCM liable directly or indirectly for such failure. If Customer believes that any Statement does not accurately reflect the activity in Customer's account(s), Customer agrees to contact FCM by telephone or email to verify the account status and accurate activity within two (2) business days after placing any order if Customer has not been advised by telephone or email of the status of such order by FCM within twenty-four (24) hours after said order(s) was/were placed. This consent shall be effective until revoked in writing, signed by the undersigned and delivered to FCM at INTL FCStone Financial Inc.- FCM Division, 230 S. LaSalle Street, Suite 10-500, Chicago, IL 60604. Telephone (312) 780-6700. In addition, Customer agrees and acknowledges that for its protection and the protection of FCM, any request to change the email address listed below must be in writing and bear the signature of the undersigned or another authorized representative of Customer.

- [x] Customer authorizes FCM to provide all Statements solely by electronic transmission.
- [ ] Customer requires FCM to provide all Statements by regular mail. Customer agrees and acknowledges that a fee of $2.00 as applicable may be charged to Customer for each Statement mailed within the USA or a fee of $3.00 for each Statement mailed outside the USA. This fee will be charged to Customer's account with FCM. (Note: This fee will also apply to duplicate Statements and will be charged to the Customer).
- [ ] Request access via INTL FCStone Connect Portal. Note an email address is needed in order to create a user ID.

Customer Email address: _PYoon@gmail.com_

**I authorize FCM to send electronic Statements to the following Agents and other service providers:**

| Agent or Service Provider Name | Agent or Service Provider email address |
|---|---|
| Agent or Service Provider Name | Agent or Service Provider email address |

**I authorize FCM to send electronic Statements to the following Interested Parties:**

| Interested Party Name | Interested Party email address |
|---|---|
| Interested Party Name | Interested Party email address |

| Individual - Joint Account Holders - Sole Proprietorship | Corporation, Partnership, Limited Liability Company, Trust: (All General Partners sign) |
|---|---|
| _PAUL YOON_ <br> Print Customer Name | Print Customer Entity Name |
| | Print Signatory Name |
| Signature [signed]   Date: _15_ / _02_ / _2018_ <br> Day / Month / Year | Title |
| | Signature   Date: __ / __ / __ <br> Day / Month / Year |
| Print Joint Customer Name | Print Signatory Name |
| | Title |
| Signature   Date: __ / __ / __ <br> Day / Month / Year | Signature   Date: __ / __ / __ <br> Day / Month / Year |

27

**INTL·FCStone**

## INTRODUCING BROKER AUTHORIZATION

The undersigned Customer wishes to open a commodity futures and/or options on futures account (the "Account") with the FCM Division of INTL FCStone Financial Inc. (the "futures commission merchant" or the "FCM") introduced by or referred by [ Trean Group LLC ] (the "Introducing Broker" or "IB"). Because the IB is not a member of certain exchanges and may not be subject to exchange jurisdiction, Customer agrees that its Accounts are to be carried with the FCM on a fully-disclosed basis. Customer understands that for a futures and/or options on futures account: (i) the relationship between FCM and its employees and the IB, is that the FCM is only responsible to clear trades on behalf of Customer introduced by or referred by the IB (ii) the IB may or may not have the ability to execute trades with the FCM on behalf of the customer it has introduced or referred; (iii) the IB is not controlled by FCM; (iv) the IB has access to view the activity in Customer's account and may or may not be subject to CFTC and NFA regulations; (v) commissions and/or fees charged to Customer's Account(s) include the IB's fees and/or commissions, the FCM's fee for clearing transactions, and any applicable NFA fees. Customer agrees that FCM shall not be responsible or liable whatsoever for any matter, as applicable, relating to sales practices, trading practices, errors in order entry or any act or omission of the IB, it being expressly understood, agreed and acknowledged by Customer that FCM's sole responsibilities in connection with Customer's accounts relate to the execution, clearing, accounting and confirmation of transactions for Customer's account on various exchanges in accordance with usual and customary practices. Customer agrees to refrain from bringing any action or counterclaim against FCM for any redress with respect to any matter other than FCM's gross negligence or wiliful misconduct in executing, clearing and/or accounting of transactions. For IB's guaranteed by the FCM, relating to guaranteed IB's obligations under the Commodity Exchange Act or CFTC regulations, Customer acknowledges that such guarantee is limited.

| Individual - Joint Account Holders - Sole Proprietorship | Corporation, Partnership, Limited Liability Company, Trust: (All General Partners sign) |
|---|---|
| PAUL YOON | |
| Print Customer Name | Print Customer Entity Name |
| | |
| Signature  Date: 15 / 02 / 2018  Day  Month  Year | Print Signatory Name |
| | |
| | Title |
| | Signature  Date: __/__/__  Day  Month  Year |
| | |
| Print Joint Customer Name | Print Signatory Name |
| | |
| | Title |
| Signature  Date: __/__/__  Day  Month  Year | Signature  Date: __/__/__  Day  Month  Year |

28

**INTL FCStone**

## CONSENT TO INTERAFFILIATE FUNDS TRANSFER

Sign and deliver this letter if Customer will trade with more than one INTL FCStone entity in order to authorize each INTL FCStone entity, as your counterparty, to transfer funds between accounts held by INTL FCStone. Absence of an account number next to a checked subsidiary below will be understood to mean a new account application is pending and the account number has not yet been assigned. INTL FCStone will designate the appropriate accounts as eligible for interaffiliate funds transfers upon assignment of the account number.

Customer Name: _____

INTL FCStone Markets, LLC
INTL FCStone Ltd
INTL FCStone Financial Inc.- FCM Division
INTL FCStone Commodities DMCC
INTL Asia Pte. Ltd.

To whom it may concern:

I hereby authorize the FCM Division of INTL FCStone Financial Inc., INTL FCStone Markets, LLC, INTL FCStone Ltd., INTL FCStone Commodities DMCC, and INTL Asia Pte. Ltd. to transfer funds between the following accounts for purpose of covering the cost of margin calls and/or the purchases of futures, options on futures, swaps, forwards or foreign exchange contracts, as applicable.

☐ INTL FCStone Markets, LLC            Account # _____
☐ INTL FCStone Ltd                     Account # _____
☐ INTL FCStone Financial Inc. - FCM Division   Account # _____
☐ INTL FCStone Commodities DMCC        Account # _____
☐ INTL Asia Pte. Ltd.                  Account # _____

This letter shall serve as your authority to make such transfers as may be necessary for any trades in these accounts.

**Individual - Joint Account Holders - Sole Proprietorship**

_____
Print Customer Name

_____
Agent Name (if documents are being executed by an Agent on behalf of Customer)

_____  Date: ___/___/___
Signature                    Day  Month  Year

_____
Print Joint Customer Name

_____
Agent Name (if documents are being executed by an Agent on behalf of Customer)

_____  Date: ___/___/___
Signature                    Day  Month  Year

**Corporation, Partnership, Limited Liability Company, Trust:**
(All General Partners sign)

_____
Print Customer Entity Name

_____
Print Signatory Name

_____
Title

_____  Date: ___/___/___
Signature                    Day  Month  Year

_____
Print Signatory Name

_____
Title

_____  Date: ___/___/___
Signature                    Day  Month  Year

**FOR OFFICE USE ONLY**

Transfer from #: _____

Transfer to #: _____

29

**Form W-9**
(Rev. November 2017)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer
## Identification Number and Certification

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give Form to the requester. Do not send to the IRS.**

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

PAUL YOON

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only one of the following seven boxes.

[✓] Individual/sole proprietor or single-member LLC
[ ] C Corporation
[ ] S Corporation
[ ] Partnership
[ ] Trust/estate

[ ] Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

[ ] Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.) See instructions.

1657 Federspiel Street

6 City, state, and ZIP code

Fort Lee, NJ 07024

7 List account number(s) here (optional)

Requester's name and address (optional)

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

Note: If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**

██████████

or

**Employer identification number**

## Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**

Signature of U.S. person ▶

Date ▶ 2/15/2018

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

Future developments. For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

Cat. No. 10231X

Form **W-9** (Rev. 11-2017)